William G. FLANIGAN, et al.,

v.

GENERAL ELECTRIC CO., et al.

No. 3:93CV516 (JBA).

United States District Court,
D. Connecticut.

March 29, 2000.

J. Daniel Sagarin, Elias A. Alexiades, Hurwitz & Sagarin, Milford, CT, Jerome Marcus, Berger & Montague, Philadelphia, PA, Jeanne Wrobleski, Kohn, Swift & Graf, Philadelphia, PA, Ronald H. Surkin, Disanti, Hamilton & Gallagher, Media, PA, Francis J. Robinson, Wolf, Berk, Gains & Liss, Philadelphia, PA, David S. Preminger, Rosen, Preminger & Bloom, New York City, J. Dennis Faucher, Miller, Fauchedr, Chertow, Cafferty & Wexler, Philadelphia, PA, Alan M. Sandals, Sandals, Langer & Taylor, Philadelphia, PA, Joseph C. Kohn, Kohn, Swift & Graf, Philadelphia, PA, for William G. Flanigan, Roger L. Pape, David J. Osterhout, Marvin F. Sedlacek, Alan R. Saydah, Joseph E. Leone, Stephen Loughin, Donald R. Bloyer, Joseph G McGuire, Melvin L. Gilbert, plaintiffs.

Alan M. Sandals, Sandals, Langer & Taylor, Philadelphia, PA, for Mark H. Trzyzewski, Stephen J. Smith, David P. Cranston, plaintiff.

US Court of Appeals, Office of the Clerk, New York City, plaintiff pro se.

Mark S. Dichter, Morgan, Lewis & Bockius, Philadelphia, PA, John S. McGeeney, Patrick W. Shea, Jenifer Magyar Bologna, Paul, Hastings, Janofsky & Walker, Stamford, CT, for General Electric Co., Dale F. Frey, Michael J. Cosgrove, John H. Myers, Joel R. Wilson, Arthur S. Bahr, Alan M. Lewis, Eugene K. Bolton, Donald W. Torey, defendants.

Morgan D. Hodgson, Steptoe & Johnson, Washington, DC, for Lockheed Martin Corp., defendant.

## RULING

ARTERTON, District Judge.

I. Procedural and Factual Background ........................................239
 A. Facts Relating to Prudence Challenge to T–Bill Investment (Count III).....239
 B. Facts Relating to Failure to Provide Information Claim (Count I) ............244
 1. Information Provided to Plaintiffs ...................................244
 2. Plaintiffs' Evidence that Martin and GE had decided on benefits prior
 to March 23, 1993 disclosure ......................................249
 C. Facts Relating to Partial Termination Claim (Count II) .....................250

II. Standard ................................................................250

III. Discussion...............................................................251
 A. Prudence Attack on T–Bill Investment (Count III)—Martin's Motion for
 Summary Judgment.................................................251
 1. Martin's fiduciary status........................................251
 2. "Knowing Participation" Liability.................................253
 B. Prudence Attack on T–Bill Investment (Count III)—GE's Motion for
 Summary Judgment.................................................254
 C. Failure to Provide Information (Count I)—Martin's Motion for Summary
 Judgment........................................................258
 D. Failure to Provide Information (Count I)—GE's Motion for Summary
 Judgment........................................................260
 E. Partial Termination Claim Against Martin (Count II) .......................264

1. Allocation of Surplus Assets on Partial Plan Termination ................265
2. Exhaustion Requirement .........................................268

IV. Conclusion ......................................................272

In this litigation under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et. seq.*, plaintiffs challenge certain aspects of Lockheed Martin's ("Martin") purchase of General Electric's Aerospace Division ("GE"). This large corporate transaction allegedly resulted in the displacement of thousands of employees, reductions in benefits for thousands more, and the premature retirement and/or resignation of a number of employees who did not transfer employment to Martin due to their uncertainties about the benefits to be provided. Martin and GE, for their part, argue that they have done everything ERISA requires and more in facilitating the purchase agreement. After two motions to dismiss resulted in a winnowing of the claims presented, this Court conditionally certified two sub-classes of plaintiffs. Both GE and Martin now seek summary judgment as to all plaintiffs' claims.

## I. PROCEDURAL AND FACTUAL BACKGROUND

As part of the defense industry cutbacks prevalent in the early 90's, Martin acquired GE's aerospace division in a complex transaction that closed in early April 1993. Pursuant to the transaction agreement, Martin agreed to hire all GE Aerospace employees, and a certain portion of GE's pension assets was transferred to Martin to fund the pension obligations Martin assumed for those employees. Shortly before the closing, plaintiffs (then employees of GE) instituted this action, seeking a preliminary injunction to prevent the pension transfer. In April of 1993, however, the transfer proceeded without intervention by the court.

In ruling on GE and Martin's motions to dismiss, the Court eliminated plaintiffs' claims that they had an unconditional right to remain participants in the GE Plan notwithstanding the discontinuation of their employment, and that both the pension transfer itself *and* the amount of the transfer violated ERISA, in that plaintiffs were entitled to a pro rata share of the GE Plan's excess funding upon transfer. Upon Martin's second motion to dismiss, the Court also dismissed plaintiffs' claims that a partial plan termination occurred when Martin eliminated certain layoff benefits that had been part of GE's Plan, and that the discontinuation of these benefits violated ERISA. *See* Docs. # 144, # 160.

The Court then conditionally certified two sub-classes of plaintiffs to pursue the remaining claims. Sub-class One, defined as all former GE employees who retired or resigned from GE between the announcement of the sale and the closing, challenge the nature and timing of the information provided by GE and Martin regarding the benefits that Martin would offer the transferring employees post-closing (Count I). Sub-class Two, consisting of former GE employees who transferred their employment to Martin, challenges the procedure by which GE and Martin arranged the transfer of an initial $1 billion in pension plan assets from one plan to another (Count III). Sub-class Two also brings a claim against Martin alone, alleging that the sequence of consolidation and downsizing moves subsequent to the GE sale constituted a partial plan termination under ERISA (Count II).

### A. Facts Relating to Prudence Challenge to T–Bill Investment (Count III)

The sale of GE's aerospace division to Martin was governed by a complex document known as the "Transaction Agreement" which required Martin to offer employment to all GE Aerospace employees and to create a successor pension plan for

the transferring employees. Pl.Dep.Ex. 187 at LMC2510–13.[1] The GE pension plan ("GE Plan") was a defined benefit plan, and the transaction agreement provided that GE employees who accepted Martin's offer of employment would cease to participate in or accrue further benefits under that plan; instead, they would become participants in a new plan established by Martin, and upon retirement would receive pension benefits paid solely by the Martin plan, but based on cumulative years of service with both GE and Martin. Pl.D.Ex. 187 at LMC2513–14. The transaction agreement required that as of the closing date, the GE Plan would transfer both the accrued pension benefit liabilities of all accepting employees and a defined amount of GE Plan assets to the new Martin plan. Sufficient assets to satisfy the requirements of ERISA and applicable IRS regulations were to be transferred, along with a portion of the GE Plan's surplus assets, as the GE Plan was over-funded at the time of the merger.

The amount of pension assets to be transferred was determined according to a complex formula set out in the transaction agreement. As GE and Martin would not know the number of employees who accepted Martin's offer until after the closing date, the parties could not calculate the exact amount of pension liabilities and assets that needed to be transferred until that point. Therefore, the transaction agreement provided that the asset transfer was to take place in two stages. An initial amount of $1 billion would be transferred immediately upon the closing, plus an amount adjusted in an agreed-upon manner to reflect the passage of time and interest earned on that amount since December 31, 1992, the date used to calculate assets and liabilities for ERISA reporting requirements. Bunt Dep. at 51–51, GE Ex. 5. Had a later date been chosen for the valuation, GE would have incurred significant expense and time re-calculating the asset amount, yet had the parties based their calculations on "rough estimates" premised on November 1992 figures, it would have "cause[d] tough sledding with the Govt." GE Ex. 85. Following the closing, the precise amount to be transferred would be calculated, based on the number of employees accepting Martin's offer, from which would be subtracted the initial transfer amount of $1 billion, and the "residual transfer amount" would then be transferred to the Martin plan. Pl.D.Ex. 187 at LMC 2513–14.

Given that the plan at issue was a defined benefit plan, the sponsoring employer bore the risk of gain or loss from the plan's investments. *See Hughes Aircraft v. Jacobson,* 525 U.S. 432, 119 S.Ct. 755, 761, 142 L.Ed.2d 881 (1999) (In context of defined benefit plans, "the employer typically bears the entire investment risk and ... must cover any underfunding as the result of a shortfall that may occur from the plan's investments."). The parties to the transaction anticipated that the closing would occur at the end of the first quarter 1993, but the transfer amount had to be determined earlier, as noted above. Therefore, GE and Martin had to determine who would bear both investment responsibility and risk for the $1 billion transfer amount between December 31, 1992, the date at which the amount could be calculated, and the closing, occurring on an as-yet-uncertain date in the future. According to the drafts of the Transaction Agreement contained in the record, and the deposition testimony of various executives involved in the negotiations, GE initially proposed that Martin control the investment of the transfer amount for the specified period, and that any investment gains or losses would be reflected in the ultimate transfer amount. Pl.D.Ex. 25;

---

1. The volume of exhibits referred to by plaintiff as "Deposition Exhibits" will be cited to as "Pl.D.Ex. ___," while the third volume of plaintiff's exhibits, entitled "Plaintiff's Other Exhibits," will be cited as "Pl.Ex. ___." The defendants exhibits will be cited to as "GE Ex. ___" and "Martin Ex. ___." The Court will cite to deposition testimony submitted by all parties with the name of the deponent and transcript page number.

Barreca Dep. at 52, GE Ex. 1. Martin rejected this proposal, indicating that it wanted the full amount of $1 billion available at closing, and not subject to investment risk, in order to establish the new Martin plan. Dammerman Dep. at 16, 46. According to negotiators on both sides of the table, Martin did not want fiduciary status or obligations prior to the closing. Barreca Dep. at 52; Block Dep. at 211–12, 227.

In light of these concerns, the parties finally agreed that the initial transfer amount of $1 billion would be segregated from the remainder of GE's pension assets as of December 31, 1992 and invested in 90–day treasury bills ("T-bills"). While the record does not indicate who suggested the final compromise, Dammerman, GE's Chief Financial Officer, and one of the negotiators to the agreement, testified that "I can't recall specifically whether I said it, someone else said it, whether it was the GE side or the Martin Marietta side, but it's a pretty obvious thing that you got two choices, if that's the case, put it in cash or you put it in a treasury instrument that is not subject to swings in market value." Dammerman Dep. at 16. Plaintiffs do not point to any disputed facts regarding these negotiations, or the respective objectives of Martin and GE in those negotiations. The relevant provision of the final transaction agreement reads as follows:

> As of December 31, 1992, GE shall cause the trustee of each Pension Plan to segregate, in cash or cash-equivalents $1,000,000,000 representing a portion of the total assets (estimated by GE and understood by MMC to be approximately $1,650,000,000) allocable to Transferred Employees as of December 31, 1992 and to invest such assets (I) in ninety (90) day Treasury Bills or (ii) as mutually agreed in writing by GE and MMC, *in each case to the extent consistent with GE's fiduciary obligations under ERISA.* In the case of (ii) above, GE shall designate, and MMC shall acknowledge its status as, a 'named fiduciary' (within the meaning of Section 402(a)(2) of ERISA) with respect to the GE Pension Plan.

Pl.D.Ex. 187 at LMC2512 (emphasis added). The agreement further provided that the assets segregated pursuant to the above paragraph, "including earnings or losses attributable to the investment of such assets in the manner provided in [the paragraph quoted above]," would be delivered to the new Martin plan at closing. *Id.* After the closing, GE was to calculate the residual transfer amount, and deliver it to the Martin plan as well. *Id.* Neither Martin nor GE ever investigated the alternative investment approach allowed in (ii) of the above paragraph. Block Dep. at 212–213.

The trustees of GE's pension plans then reviewed the transaction agreement. All testified at their depositions that they believed they had an independent obligation to review the proposed investment to determine if it was consistent with their fiduciary duties to the plan, or whether an alternative investment could provide the same required returns by the closing date. Myers Dep. at 32; Bolton Dep. at 28–29; Cosgrove Dep. at 53–54; Frey Dep. at 32–33. The trustees acknowledged, however, that while they considered ideas such as a 'hedging strategy' or a 'put call,' Frey Dep. at 33, they did not have many in-depth discussions, because as Trustee Frey put it, "if you had a 90–days investment to make, then a 90 day T-bill jumps right out at you." *Id.* Moreover, the parties to the agreement did not engage in an extended market analysis to determine whether the market was likely to go up or down over the first ninety days of 1992. Dammerman Dep. at 48–49 (recalls no discussions with Martin's CFO regarding future performance of markets); Block Dep. at 243. The GE trustees testified that short-term market behavior is difficult to predict, and that they made investment decisions based on a long-term strategy. Cosgrove Dep. at 90 ("We, as a general rule, are long-term investors and not market timers.");

Bolton Dep. at 54 ("I don't believe we would have had a short-term view of the market for a period of weeks with any certainty we would know what was going to happen to the market."). The trustees received monthly information concerning market conditions and trends, and the November 1992 reports indicated volatility and the possibility of a market correction, due to sluggish growth, international economic factors and the unknown effect of the recent election of President Clinton and the new Congress on the stock market. Cosgrove Dep. at 104–05; GE Exs. 205–06. According to the trustees, given the liquidity need to have the funds available for transfer along with a set amount of interest, and given the fact that in the case of a short-term market downturn GE would have been required to make up the difference at the closing, "the most prudent investment vehicle to deliver the funds that were specified in the contract was the 90–day treasury bill." Myers Dep. at 45.

Plaintiffs point out that GE did not convert any of its remaining assets to cash or invest in T-bills at that time, nor had it done so at any point in the plan's history. Cosgrove Dep. at 89; Pl.D.Ex. 101 and 102 (quarterly statements of pension trust). Plaintiffs also look to contemporaneous analyses performed by the trustees and the GE Investments Allocation Committee taking the position that current economic indicators generally favored investments in stocks. Pl.D.Ex. 206. The plaintiffs' experts state in their reports that the fundamental principles of prudent investment management require that fiduciaries remain focused on the long-term investment horizon by actively managing the investment portfolio, maintaining most assets in equities and stocks and keeping cash holdings to a minimum. Schwan Report at 3–7. Plaintiff's ERISA expert opines that the change in the sponsorship of the pension plan and the change in the identity of specific investment managers for those investments did not require greater liquidity than the GE plan had at the time, nor was

there a justification under prudent investment management fundamentals to change from the "active investment strategy" employed by both GE's plan and the then-existing Martin plan. Gordon Report at 8.

While the trustees testified that they did consider alternative strategies, they agreed that they were locked into the contract between GE and Martin, in terms of the amount that the pension plan had to be able to transfer at the closing. Cosgrove Dep. at 41–42 ("As trustees of the GE Pension Trust we had nothing to decide. We were trying to comply with the legal contract somebody else had written."); Dammerman Dep. at 38 (only discussions on topic of how to invest pension assets was single discussion of whether "there was another way to invest the billion dollars that would do the same thing, protect the principal"). The record is clear that the trustees did not believe they had the authority to override the agreement between Martin and GE that $1 billion in assets be segregated and transferred at closing along with interest at the 90–day T-bill rate; rather, the trustees simply looked to whether there were any alternate means of achieving the result that had been agreed to by the parties, without subjecting the $1 billion to excessive investment risk. See Cosgrove Dep. at 94 (only discussions among trustees relating to Martin transaction was whether "there was a way, other than the use of Treasuries, to execute a strategy to achieve what [the] contracting parties wanted to do"); Bolton Dep. at 28–29 (discussions with other trustees focused on "how the assets should be invested, the billion dollars that we had to provide at a specific date and time and then some discussion about what alternatives might be to protect or to invest the money so there wouldn't be any downside over this relatively short period of time").

The trustees were aware that if they chose a less secure investment strategy, and GE's portfolio lost value due to a

market downturn, any short fall would be "to GE's account"—that is, GE would be required to make up the difference in order to transfer the agreed-upon amount. *See* Frey Dep. at 33. Several of the Trustees also indicated in their deposition testimony that the contract between GE and Martin determined the outcome of their decision. Cosgrove Dep. at 42 (When asked who made the decision to put the transfer amount into treasury bills, responded "I think the contract told us to put it into Treasuries.")

GE's expert Ellen Hennessy states in her report that in her experience, "plan sponsors routinely negotiate the form in which assets are to be transferred from one plan to another," and "a transfer in cash is not uncommon." GE Ex. B, Tab 1. She concluded that the GE Plan fiduciaries acted prudently in investing the $1 billion in T-bills prior to the closing, as

> [t]here would have been a significant risk of large losses during the period between December 31, 1992 and the closing date of the GE aerospace business sale if the $1 billion in assets earmarked for the [transitional Martin plan] had remained invested in the same manner as the GE Pension Plan assets were invested as a whole. Since 1926, a portfolio composed of a 50–50% mixture of large company stocks and long-term corporate bonds has had losses in 86 calendar quarters out of 288.

*Id.* at 3–4. She opined that the fiduciaries were not required to obtain any legal written opinion as to whether the conversion of plan assets and the T-bill investment were prudent under ERISA, as in her experience "such opinions are rarely, if ever, sought or given in such transactions," because such decisions are investment decisions, not legal issues. Her firm also conducted a survey of 150 large pension plan sponsors for their views as to appropriate actions relating to transfers of pension trust assets. GE Ex. C. A majority of those responding to the survey indicated that if they were required to transfer a

certain percentage of the assets in cash or cash equivalents, plus a specified interest rate, on a transfer date that was 90 days after the valuation date, they would liquidate the assets on the valuation date and incur minimal risk on the funds by choosing a conservative investment vehicle that would provide a fixed rate of return comparable to treasury bills. *Id.* This survey, however, did not disclose the gross amount that the percentage represented in this case, i.e. $1 billion.

Plaintiffs' investment expert conceded in his deposition that, in a hypothetical situation where an ERISA fiduciary needed to liquidate 5% of a pension plan's assets to provide lump sum distributions to retirees within a 90–day time frame, deciding to not subject those assets to market risk and placing them in a secure investment for the 90–day period was prudent. Schwan Dep. at 211.

None of the trustees had any prior experience with an asset transfer in an amount as large as the $1 billion transfer provided for in the transaction agreement, nor were the trustees aware of any pension asset transfers where the assets had been liquidated and held in T-bills prior to the transfer. Bolton Dep. at 44; Bennett Dep. at 19–20. In subsequent agreements with Loral and Lockheed, *see infra,* pension investments were not liquidated, but were transferred in kind. Martin's chief negotiator of the benefits and pension assets transfer portion of the transaction agreement, Assistant General Counsel Marion Block, did not consult with Martin officials such as the Director of Pension Investments, Hendon Dep. at 15–16; Martin's Treasurer, McGregor Dep. at 14; Martin's Chief Financial Officer, Bennett Dep. at 32; or Martin's Controller, Buchanan Dep. at 39. GE trustees and pension officials testified that logistically, the pension investments could have been liquidated in a relatively short period of time. Myers Dep. at 57; Frey Dep. at 66 (does not recall how long it took to liquidate assets

to raise $1 billion, "but I would imagine we're pretty good at doing it very fast.")

As demonstrated by the existence of this litigation, the actively invested portion of GE's pension assets performed better than the 90–day T-bill rate over the relevant period. According to Plaintiffs' investment expert, the difference between the GE Plan's portfolio return for the period the $1 billion was invested in 90–day treasury bills and the actual return earned on the T-bill investment is $34,615,000, and it is this amount that plaintiffs seek in recovery for the new Martin plan.

**B. Facts relating to claim that GE and Martin failed to provide clear and complete information regarding future benefits (Count I)**

**1. Information Provided to Plaintiffs.**

As noted above, the final version of the Transaction Agreement dated November 22, 1992 required Martin to offer employment to the more than 30,000 employees of the affected GE units, and to provide "substantially similar" employee benefit plans for those employees through the end of 1993. Pl.D.Ex. 187 at LMC2510–11. The record demonstrates that Martin was reluctant at first to accept the "substantially similar" language, as it wanted to maintain the flexibility to implement benefits plans that were "commercially practicable," but it ultimately acceded to GE's position. Block Dep. at 160. The Transaction Agreement also provided that at the closing, GE and Martin would enter into a benefit administrative agreement whereby GE would "provide investment, management and administrative services with respect to benefit plans and arrangements adopted by the parent." Pl.D.Ex. 187 at LMC2512.

The Transaction Agreement between GE and Martin was signed on November 22, 1992, and announced publicly on November 23. In a November 23 joint letter to GE employees from the CEO's of both corporations, GE's Jack Welch and Martin's Norman Augustin assured employees that

> We will provide you with regular and complete reports on the status of the merger. You will receive comprehensive information on your benefits, including the successor employer provisions of GE's plans and the terms for transition to Martin Marietta's generally comparable benefits package. You will be promptly informed of organization and staffing decisions that affect your role in Martin Marietta.

Pl.D.Ex. 35. Employees reacted strongly to the news of the merger, and in particular raised many inquiries regarding the meaning of "generally comparable" benefits. Welch Dep. at 59–60. To address these inquiries, an "Additional Statement on Benefits Provisions in the GE Aerospace—Martin Marietta Merger Agreement" was released on November 24, 1992. This statement informed GE Aerospace employees that:

1. Full GE benefits coverage will continue to the merger date.

2. Coverage under Martin Marietta's plans will begin on the merger date. The merger will occur in the first half of 1993. At that time, Martin Marietta will provide transition benefit plans that are substantially similar to the current GE plans. Coverage under these plans, which will be essentially the same as GE's plans, will continue at least to the end of 1993.

3. From the merger date forward, transferred employees of all GE operations involved in the merger transaction will be given full credit for GE service for eligibility, vesting, and benefit accruals under Martin Marietta benefit plans and programs.

Pl.D.X. 125. On December 2, 1992, a letter from GE CEO Welch was distributed to all GE employees. The letter explained the rationale for the merger, and outlined

"key features" of the merger arrangement with Martin. In relevant part, the letter stated that

> Martin Marietta will provide pay and benefits that are essentially equal to GE's programs through the end of 1993. For the longer term, employees can expect wages and benefits under Martin Marietta that are competitive with industry practices, as are those provided by GE.

Pl.D.Ex. 124.

Beginning on December 10, 1992, a series of communications entitled "Teaming Update" were distributed to GE employees. GE published these updates, but Martin controlled the content pertaining to post-closing benefits. Welch Dep. at 37–38. The first Teaming Update contained the following statements:

> It is our intent to keep you as fully informed as possible as events connected to the merger unfold and as information becomes available.... The merger announcement has generated literally thousands of questions from employees on a range of issues, from benefits to employment practices in the new company, from transition plans to specifics about Martin Marietta's current product lines, to cite just a few examples. We want to respond quickly to these concerns, but more importantly, we want our responses to be correct.
>
> The fact is that it will take longer to answer some questions than others. For instance, some of the benefit questions raised are very complex. They need to be thoroughly researched and considered by both GE and Martin Marietta people working these issues. Many involve legal and tax ramifications which must be carefully deliberated. This will require diligent effort on our part, and patience on your part.

Pl.D.Ex. 126. This issue, like the ones that followed, included a question-and-answer portion that addressed specific inquiries regarding the transitional and 1994 benefits that Martin would offer:

> Martin Marietta will provide benefits that are essentially equal to GE's programs through the end of 1993. Decisions on what the benefits package will be in 1994 have yet to be made. A transition team of Aerospace and Martin Marietta people will be working together on benefits design in the coming year. Martin Marietta will fully inform employees of 1994 benefit plans well before the effective date.

*Id.* References to "essentially equal" benefits were also made in the Teaming Updates issued on December 18, 1992, Pl. D.Ex. 127, and December 23, 1992, Pl. D.Ex. 128. The January 8, 1993 Teaming Update included a question-and-answer exchange suggesting that some employees at GE felt the information being disclosed was insufficient:

> Q: It seems like the merger closing date is forcing us to make a decision to retire in a hurry and without all the facts. Why are GE and Martin Marietta rushing to complete the merger?
>
> A: .... The intent is not for anyone to make a hasty decision to retire. Our efforts have been directed at providing complete GE retirement benefits information for those eligible to retire so they can make an informed decision.

Pl.D.Ex. 129.

GE sent a special package to the homes of several thousand retirement-eligible GE employees on or around December 15, 1992. This package included a cover letter from Larry Phillips, Vice President of Human Resources at GE, a set of Benefit Questions and Answers, a brochure entitled 'A Guide to Retirement Choices,' and a videotape entitled 'The GE Aerospace/Martin Marietta Merger: Your Retirement Options.' GE Exs. 166–170. The videotape also utilized the "essentially equal" language, and in the context of an illustrative hypothetical, describes the future Martin plan as "identical" to the GE plan. GE Ex. 166 at GE04890, GE04895. The videotape explained that:

Retirement is one of the biggest decisions you will make during your lifetime. And it is important to have as much information as possible. There is a lot of information in the material that came with this tape. More information from GE and Martin Marietta will follow. But for now you can be assured that you do not have to change your retirement plans due to the merger.

*Id.* at GE04909. The December Teaming Updates also informed GE employees that the last day they would be able to retire directly from GE would be the day before the merger closing date, at that time projected to occur on February 26, 1993. Pl. D.Ex. 128 at GE00819.

A Philadelphia Inquirer article dated January 13, 1993 reported that GE employees were still concerned about their pension benefits and the soundness of the Martin pension plan, and had authorized an employee group to obtain legal representation. Pl.D.Ex. 131. In a teleconference hosted by GE's Gene Murphy, a transcript of which was created and distributed via e-mail, GE's Larry Phillips acknowledged these concerns in stating:

That leads me to the other question which is fundamental uncertainty—uncertainty in the form of the rest of 1993. We published a statement that benefits will be substantially similar and everyone is asking the question, and rightly so, what does that mean. I hope we will have an answer to this in a week to ten days. Clearly the savings plan has to change because it is built around a GE plan with GE securities but the changes I expect to see will not be dramatically different than the GE Plan, but we will have wait (sic) until we see that in final form.

Pl.Ex. 4 (Pluta Aff.) at P00737. The record further indicates that over this time period, GE was pressing Martin to disclose further information about post-merger benefits in order to quell the apparent employee discontent. For instance, the Philadelphia Inquirer article mentioned

above was faxed to Tom Kinstle at Martin with a hand-written note from GE's Larry Cook: "Per our earlier discussion, it's critical that MMC communicate '93 benefits' at the earliest opportunity." Pl.D.Ex. 131. Perhaps in response to such concerns, Martin CEO Norm Augustine issued a letter addressed to GE Aerospace employees on January 23, 1993. He assured GE employees that the pension benefits they have earned would be fully protected in the transaction, and indicated that the Martin plan was in a surplus position. Pl.D.Ex. 134. He then went on to state that while Martin could not guarantee that the pension plan would never change, "it is our objective to provide each transferring GE employee, who later retires from Martin Marietta, with regular pension benefits no less than those that would have been received under the terms of the GE pension plan now in effect." *Id.* Plaintiff emphasizes an earlier draft of the Augustine letter, which read as follows:

Allow me first to address the issue of pensions. The impact of this merger on the pensions of former GE employees can be described succinctly as *none.*

Pl.D.Ex. 58 (emphasis in original). This version, however, was not distributed to employees. Accompanying the Augustine letter that did go to employees was a series of "Talking Points" for managers, which included the following bullet points:

●The goal is to have identical or "substantially similar" benefits throughout 1993.

●The term "substantially similar" is used since, in some cases, identical benefits cannot be provided, as is the case with the Savings Plan since investment options in GE's S & SP are available only to active GE employees. There may be some other minor differences because of items such as insurance carrier requirements or systems differences.

*Id.* at GE02914. The talking points also acknowledged a "high level of frustration around the amount of pension and benefit information that we have been able to

provide to you," and cited the complexity of the deal as an explanation for the delay in providing information. *Id.*

Augustine's statement that Martin's pension would be "no less than" a GE pension also apparently sparked some concerns among GE employees, and on February 9, 1993 GE's Phillips circulated another question-and-answer series to managers to address any confusion. Pl. D.Ex. 68. The following exchange is included:

Q: So what does Norm Augustine's statement about an objective of making a transferee's Martin Marietta Pension at least equal to my GE Regular Pension mean to me?

A: It means that it is Martin Marietta's objective to provide you upon retirement from Martin Marietta with a Pension benefit which is no less than the Regular Pension that you would have received from GE using the formula in effect or implemented prior to that date.

Q: Does that mean that Martin will use the GE formula in calculating my pension at retirement?

A: Not necessarily. The Martin Pension Plan formula may be different, but the objective is to have the level of benefits provided be no less than what would have been provided if the 1993 GE Pension formula was used.

*Id.* at LMC3489–90.

A Martin Marietta planning document entitled "Merger Benefits Communications" was also prepared on February 12, 1993, aimed at "providing the various Martin and GE work teams with a sense of the benefits communication tasks which need to be completed in the next 60 days or so." Pl.D.Ex. 70 at LMC2945. The document stated that GE employees "are reported to be unsettled about their benefits and are looking for information to fill in the gaps." *Id.* at LMC2946. The document lists a number of Communication Objectives, including "[r]eassure all [employees] that benefits will stay fundamentally the same" and "close any remaining communication

gaps." *Id.* at LMC2948. The document also indicates that Martin knew from GE that some employees viewed the term "substantially similar" as ambiguous, and were "looking for a clear definition of exactly what 'substantially similar' benefits will mean to them for 1993." *Id.* A final table entitled "Open Issues" states that "the following open issues will be addressed and reworked weekly until closure is reached." *Id.* at LMC2976. The third item on this list asks "[h]ow can we define 'substantially similar' benefits?" No resolution date is entered in the adjoining column, nor is the item marked as "fixed" or "tentative." *Id.*

The February 19, 1993 Teaming Update informed GE employees that "[t]he current GE formula will be used through June, 1994." Pl.D.Ex. 71 at LMC2013. The update also referred to Martin's "objective" to provide transferring employees with pension benefits which are "no less than" the benefits they would have received had they remained employed at GE. *Id.* During this approximate time period, Norm Augustine and Jack Welch went on the road, and made a series of presentations about the merger at various GE facilities. The March 2, 1993 Teaming Update included a question-and-answer sequence from some of these presentations, including the following exchange:

Q11: Some people are making important decisions about retirement, their savings and other things. Can we have a reasonable amount of time to make these decisions before we become Martin Marietta employees, and if so, how much time?

A: There is ample time to make important decisions. We are using Teaming Update, as well as special mailings to employees' homes to provide details about matters affecting benefits as soon as information about them is available.

Pl.D.Ex. 138 at GE01081. The next Teaming Update on March 10, 1993 gave GE employees a "heads up," and notified them

that information about Martin benefits would be distributed "by week of March 22." Pl.D.Ex. 139. On March 22, 1993 GE and Martin issued a "Special Edition" Teaming Update to notify employees that the transaction would not close before April 1, 1993, and that if the closing did take place on that date, "GE Aerospace employees who submit their paperwork before the close of business on Friday, April 2, 1993 ... will retire under the GE Pension Plan." Pl.D.Ex. 141.

On March 23, 1993 a Teaming Update went out to GE employees detailing Martin benefits for transferring employees. The update again emphasized that if the closing went forward as anticipated on April 1, employees wishing to retire with a pension benefit from GE had to complete their paperwork by the close of business on Friday, April 2, 1993. Pl.D.Ex. 142. The update went on to explain why the benefit summary was only now being released:

As you will see from reading the following benefits information, most benefits remain the same with few exceptions. Many of you may question why it has taken so long to finalize this information and provide it to you since so little has been changed. Some insights into the process for developing the Martin Marietta benefits summary may be helpful to appreciate the amount of time required to deal with the many complex benefits details.

There have been hundreds of hours of meetings among ... managers from Martin Marietta, GE Corporate; and GE Aerospace headquarters. These meetings helped to familiarize Martin Marietta senior managers and professionals with the numerous details and provisions of the GE Benefit Plans. Then, Martin Marietta had to negotiate contracts with each of the suppliers/administrators for each benefits program ... After each myriad set of details were decided upon, the communications were developed and reviewed by all the people involved in the decision-making process to ensure accuracy....

We understand how important your benefits are to you. That is why so much care and effort has gone into planning for the smooth transition of so many of the benefits-related services that many of you have come to expect. That doesn't mean there won't be some unforeseen glitches but certainly all those who have been involved in the transition process have tried their best to make the transition appear as seamless as possible for transferring employees.

*Id.* The attached benefits summary indicates that for 28 benefit programs, including the pension plan and medical benefits plan, "[t]he benefits under these Martin Marietta plans, for employees of transferred GE operations and in effect for 1993, are the *same as the comparable GE plans.*" *Id.* (emphasis in original). According to this summary, Martin's Security Life Insurance and Service Awards benefit programs would change, and Martin would eliminate three benefit programs previously offered by GE: Personal Excess Liability Insurance, the Product Purchase Plan, and Educational Loan Programs. *Id.* On March 31, 1993, GE and Martin announced that a 56–day "window period" GE had negotiated with the International Union of Electronic Workers would be extended to all non-bargaining employees. This "window period" would allow all transferred employees with five years of pension-qualified service to decide by May 30, 1993, to decide whether to retire from GE or continue working for Martin Marietta. Pl. D.Ex. 191.

The March 31, 1993 Teaming Update outlined the "window period," and provided that employees who had already submitted completed retirement forms could revoke their retirement election by contacting Human Resources by the close of business on March 31, 1993. Although the time of distribution of this update is not clear, the facsimile header indicates that the notice was transmitted from Human

Resources at 3:21 p.m. on March 31, 1993. Plaintiffs McGuire, Gilbert and Sedlacek testified that the information provided in the last two Teaming Updates was too late to be of any use, as for various reasons they had already planned for their retirement and completed the requisite paperwork. McGuire Dep. at 86–88; Gilbert Dep. at 36; Sedlacek Dep. at 67.

## 2. Plaintiffs' Evidence that Martin and GE had decided on benefits prior to the March 23, 1993 disclosure

Plaintiffs point to a number of instances in the record where either GE or Martin officials made reference to providing "mirror" benefits to transferring employees after the closing. For instance, Martin's Manager of Compensation and Benefits Planning Larry McAllister took notes during a December 8, 1992 telephone conference with GE's Larry Cook. Under the heading "Issues from Letter," McAllister made the following notations: "welfare plans—mirror" and "pension—same as now exist." Pl.D.Ex. 40. Cook's notes of the same conversation include "mirror welfare plans and FSA [flexible spending account]" and "mirror pension." Pl.D.Ex. 115. Immediately after this meeting Cook prepared a memorandum for his superiors at GE indicating that "Bob McAllister, Manager—Compensation and Benefits Planning has confirmed Martin's intent to mirror all of the GE benefit plans and programs." Pl.D.Ex. 114. GE and Martin held a benefits planning meeting on December 15–16, 1992 at GE's Fairfield facility; the materials prepared for this meeting by Cook and Rick Dunn of GE describe Martin's post-merger benefit plans as "mirroring" GE's current benefits. Pl.D.Ex. 46. A December 18, 1992 letter from Dunn to Barreca, Cook and other benefits and human resources professionals at GE regarding the "Outcome of Martin Marietta Meetings—December 15–16, 1992" states that "[w]ith respect to the pension plan, there was no dispute that the only alternative was a 'mirror' of the GE Pension Plan through the end of 1993. The details are set out as with the [savings and pension plan option], but it appears to be less of a challenge in that the infrastructure is already in place for the Pension Plan." Pl.D.Ex. 48.

The record indicates that Martin was reluctant to agree to identical benefits. GE's Jerome Caplan testified that he did not think the December 15 meeting resulted in the agreement implied in the Dunn letter referenced above, as "[t]here were a whole set of issues that Martin had regarding their inability to change even the smallest part of the smallest plan if they were linked to GE under the services agreement." Caplan Dep. at 145 (Def. Reply App. II). At his deposition Cook stated that he had not understood either McAllister's authority or the decision-making process at Martin at the time of the above memoranda and letters, and "any understanding I thought I had with McAllister did not, in fact, reflect the actual decision process in Martin Marietta." Cook Dep. at 81 (Def.Reply, App.II). Both GE and Martin officials testified that the Fairfield meeting revealed that Martin had not agreed on mirror plans, nor had the parties reached any agreement regarding what "substantially similar" meant. Cook Dep. at 86; Kinstle Dep. at 66 ("I would comment that the word 'mirror' appears [in the December 15, 1992 meeting materials] several places and I don't recall—someone raised their hand and said 'the contract says substantially similar.' The chart was a GE chart and it was their view."). Kinstle also testified that Martin was bound to provide similar benefits, and that Martin's focus in December and January was on understanding GE's benefits and "the practicalities of administration . . . [and] actually delivering and determining the benefits and the insurance, the carriers and the providers." Kinstle Dep. at 45. While Kinstle could not identify a particular point at which Martin decided to offer a pension plan identical to GE's or medical insurance benefits identical to

GE's, he did state that Martin did not want to deliver information about the new benefits "piecemeal," but wanted "to give participants a single document they could look to for the broadly based array of benefits they could expect. This (the March 23, 1993 Teaming Update [Pl.D.Ex. 142]) was the document that did that." Kinstle Dep. at 178.

## C. Facts relating to plaintiffs' Partial Termination claim (Count II).

After the April 2, 1993 closing of the GE Aerospace/Martin Marietta deal, the transferred employees became participants in the Trans Ops Plan, later named the Martin Marietta Corporation Retirement Income Plan. Following the GE transaction, Martin engaged in a series of business divestitures, consolidations, and mergers that resulted in the termination of some transferred GE employees. In March of 1995, Martin combined with Lockheed Corporation to become Lockheed Martin, and in April 1996 the Loral Corporation merged into Lockheed Martin. As a result of these acquisitions and the continued decline in the defense budget, Martin announced a series of consolidations that resulted in the closing of a number of facilities and the termination of thousands of employees. See Pl.Ex. 10 at LMC 24147 (September 1993 Press Release announcing 5–year "Facilities Consolidation Plan" that was to result in the reduction of approximately 46,000 employees); id. at LMC 24143 (June 1995 Press Release regarding corporate-wide consolidation plan that would eliminate 12,000 positions over next five years); id. (Printout from PR Newswire Web Site announcing additional consolidation actions to fully integrate Loral). Plaintiffs' actuarial expert Michael Greenstein analyzed the data regarding employment terminations from Martin for the period from April 5, 1993 to December 31, 1997 and determined that the Martin Plan's active participants declined by 44.8 percent. Greenstein's calculations are based on "selected exits;" that is, employees who terminated employment for reasons other than death, disability retirements, and retirements at normal retirement age. Greenstein Report, Pl.Ex. 3. "Martin's analysis reaches a different result, because it excludes terminations attributable to additional reasons, such as terminations resulting from intracompany transfers, resignations, performance-related terminations, and all retirements except retirements in lieu of lay-off and retirements where no specific reason was given by the terminating employee." Martin Ex. GG. The Martin data show a reduction of 20.3 percent over the entire period, and no more than 15.9 percent in any three-year period.

Certain plan benefits present in the GE Plan, such as the Special Early Retirement Option ("SERO") and the Plan Closing Pension Option ("PCPO"), were eliminated by Martin. Martin Ex. II, JJ. The Martin plan has also been amended to provide a right of reversion to Martin of some of the surplus assets of the Plan in the event of a Plan termination, although the Plan language expressly forbids any of the transferred GE Plan assets from reverting to Martin. Martin Ex. JJ at 69.

## II. STANDARD

Federal Rule of Civil Procedure 56(c) provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Silver v. City Univ., 947 F.2d 1021, 1022 (2d Cir.1991). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060 (2d Cir.1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and

draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

## III. DISCUSSION

### A. Prudence Attack on T–Bill Investment (Count III): Defendant Martin's Motion for Summary Judgment

Defendant Martin makes three arguments in support of its position that it is entitled to summary judgment on Count Three of the complaint. First, Martin alleges that plaintiffs' prudence challenge to the segregation of the $1 billion and investment in T-bills is in reality a veiled attack on the amount of the transfer, and thus an attempt to circumvent the Court's earlier ruling that plaintiffs do not have a claim to the residual assets in the GE plan. Second, Martin argues that it was not a fiduciary of the GE Plan at the time of the challenged investment, as it did not exercise any discretionary control or authority over the plan assets. Finally, Martin claims that plaintiffs' attempt to impose "knowing participation" liability on a non-fiduciary is unavailing, because recent Supreme Court and Court of Appeals precedent indicate that such a claim is no longer viable under ERISA. As Martin's first argument is addressed in the context of the Court's discussion of GE's summary judgment motion, *see infra* at 254, the Court will only address Martin's arguments regarding its fiduciary status.[2]

### 1. Was Martin a fiduciary of the GE Plan at the time of the T-bill investment?

To the extent that plaintiffs seek damages from Martin for the losses resulting from segregating the $1 billion transfer

amount and investing in T-bills, the Court must determine whether Martin acted as a fiduciary in negotiating for the transfer. Under ERISA, there are three ways to acquire fiduciary status: being named in a plan as a fiduciary, being named as a fiduciary pursuant to a procedure specified in a plan, or performing "fiduciary" functions. *See* 29 U.S.C. §§ 1002(21)(A) and 1102(a)(1). The parties appear to agree that it is the third category that applies. Under this provision,

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1102(21)(A). Plaintiffs claim that disputed issues of fact exist as to whether Martin exercised "discretionary authority" over the pension funds by contracting with GE to have the one billion transfer amount invested in T–Bills prior to the closing.

The Second Circuit has recognized that "Congress intended ERISA's definition of fiduciary 'to be broadly construed.'" *Lopresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir.1997). The *Lopresti* court employed a functional analysis to determine that a company officer was a fiduciary, even though he did not administer the funds of the plan, because he made the decisions about which creditors to pay out of the general company account, and had used the plan assets to pay company creditors rather than forwarding those assets to the pension plan at issue. *Id.* at 41. Even though the second defendant had the authority to sign checks, however, the Sec-

**2.** At oral argument, Martin took the position that it cannot be held to fiduciary standards for any conduct prior to the closing, since none of the plaintiffs were Martin employees at that time. However, since Martin only briefed this argument in connection with Count I, the failure to provide information claim, it is addressed in that context, *see infra* at 258.

ond Circuit held that he was not a fiduciary, because while "he had some general knowledge that deductions were made from employees' wages," he primarily was involved in production and had no responsibility for determining which of the company's creditors would be paid or in what order. *Id.* at 40. Similarly, in *Blatt v. Marshall & Lassman,* 812 F.2d 810 (2d Cir.1987), the defendant principals of an accounting firm were found to have exercised actual control over plan assets when they intentionally delayed executing certain forms that were necessary for the plaintiff to withdraw funds from the plan, in order to gain collateral advantage in an unrelated state court suit brought by the plaintiff against the firm. *Id.* at 812. *Blatt* noted that "[a]n entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary;" rather, "fiduciary status exists with respect to any activity enumerated in the statute over which the entity exercised discretion or control." *Id.*

Plaintiffs rely on the above cases and argue that Martin had *de facto* control over the assets in this case, in that it entered into a transaction agreement that obliged GE to "cause the trustee of the GE Pension Plan to" segregate $1 billion in cash and invest such assets in 90–day treasuries. The plaintiffs point to deposition testimony by GE Plan trustees that the segregation of the $1 billion from general plan assets and investment in T-bill would not have occurred but for the Transaction Agreement. Cosgrove Dep. at 99. Certain GE draft letters of agreement and internal memorandum also indicate that the disinvestment of the transfer amount resulted solely from the Transaction Agreement. Pl.D.Ex. 88 (Memorandum to GE Plan trustees MacDougall and Bolton stating that "[u]ntil the assets are released to Martin Marietta ... upon the consummation of the sale, they will remain within GE Pension Trust under the investment control of Bob MacDougall based on the guidelines established by Martin Marietta"); Pl.D.Ex. 15 (GE draft letter of agreement dated March 29, 1993 noting that "[o]n December 31, 1992, pursuant to the Transaction Agreement, the Trustees caused the segregated assets to be invested in a Treasury Bill.") Essentially, plaintiffs' argument is that by entering into a contract with GE, Martin became a fiduciary because the resulting transaction agreement affected the disposition of assets under the plan.

■ Based on the above-described record, the Court concludes that the evidence offered is insufficient to demonstrate Martin's actual control over the GE Plan. First, applicable Second Circuit precedent undermines the central tenets of plaintiffs' claim. *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir.1987) involved a provider of administrative services who sued the trustees of a pension plan for breach of a contract, and was countersued by the trustees who claimed that the provider was a fiduciary as a matter of law, and was thus liable for having caused the plan to agree to pay it excessive compensation. *Id.* at 1258. The district court refused to instruct the jury that as a matter of law, the administrative services provider was a fiduciary with respect to the plan, and the Second Circuit affirmed. The Second Circuit held that:

> When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him. Such a person is not an ERISA fiduciary with respect to the terms ·of the agreement ....

*Id.* This rationale is analogous to the instant circumstances, where a corporate entity (Martin) is negotiating a contract with an entity whose roles include plan administration (GE). While a contracting party may become a fiduciary after entering into the agreement if, pursuant to the agree-

ment, it has control over certain aspects of the plan, *see id.,* throughout the course of the negotiations Martin had no authority to compel GE to reach an agreement or to agree to its terms. Under these circumstances, mere negotiation of the Transaction Agreement with GE did not confer fiduciary status upon Martin.

This conclusion is consistent with parties' obligations under the terms of the Transaction Agreement. The employee benefits portion of the agreement clearly states that the investment will be made "in each case to the extent consistent with GE's fiduciary obligations under ERISA," Pl.D.Ex. 87 at LMC2512, and the section immediately following states that if a different strategy than the T-bill investment is chosen by both Martin and GE, then Martin will accept fiduciary status with respect to the GE Plan. *Id.* at LMC2513. Thus the contract recognized that the T-bill investment was to be subjected to an independent determination by the fiduciaries of the GE Plan, and that Martin would only become a fiduciary upon its participation in a decision to invest the funds in a different manner. Plaintiffs argue, and their expert opines, that the terms of the contract required the GE Plan trustees to relinquish their investment authority and discretion in order to carry out the T-bill investment. Pl.Ex. 2 at 12; Gordon Dep. at 382. However, the plain language of the contract conditions the T-bill investment on compliance with GE's fiduciary obligations, an interpretation borne out by the testimony of the trustees that they independently examined other investment options before deciding to utilize the transfer mechanism specified in the Transaction Agreement.

While it is clear that a party cannot contract away its fiduciary obligations arising from its exercise of discretionary authority or control, the contract at issue here is the sole source of plaintiff's contention that Martin was a fiduciary with respect to the T-bill investment, as conceded by plaintiffs' own expert during his deposition.[3] It is appropriate, therefore, to examine the contract language to determine whether particular individuals are fiduciaries under ERISA. *See Lowen v. Tower Asset Mgmt.,* 829 F.2d 1209, 1218 (2d Cir. 1987) (looking to terms of contract with plan to find that defendant investment company was "investment manager" and thus a fiduciary under ERISA). Further, the deposition testimony of negotiators and officers on both sides of the GE/Martin deal demonstrates that Martin continually refused to accept fiduciary responsibility for the transfer amount, insisting that a sum certain be available in cash or cash equivalents at the closing. The record also indicates that Martin did not push for the T-bill investment; rather, that investment was a compromise given Martin's conditions that it not accept market risk and that a set amount be readily available at the closing to establish Martin's new plan. This evidence of the intent of the parties, further bolstered by the contract construction outlined above, supports the conclusion that no pre-closing ERISA obligations were incurred by Martin as a result of the purchase and sale transaction with GE.

Thus, as a matter of law, Martin was not acting as a fiduciary when it entered into the transaction agreement requiring the GE Plan trustees to segregate $1 billion and invest it in T-bills, "consistent with the GE's fiduciary obligations under ERISA." Pl.D.Ex. 87.

### 2. Can Martin be Liable for "Knowing Participation" in a fiduciary breach by GE?

Even if Martin was not a fiduciary with regard to the T-bill investment, plaintiffs

---

**3.** Gordon Dep. at 387 (Q: "... you testified earlier that your opinion concerning Martin Marietta is not based on any fact other than the fact that Martin Marietta entered into the transaction agreement containing the provisions in question, correct?" A: "That is correct.").

claim that it can still be held liable for knowingly participating in GE's fiduciary breach under § 502(a)(3). Defendants argue that "knowing participation" claims against non-fiduciaries are no longer cognizable after the Supreme Court's decisions in *Mertens v. Hewitt Assoc. Inc.*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) and *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 1447, 128 L.Ed.2d 119 (1994). Several circuits and district courts have agreed. *See Reich v. Rowe*, 20 F.3d 25 (1st Cir.1994); *Reich v. Continental Cas.*, 33 F.3d 754, 757 (7th Cir.1994); *Reich v. Compton*, 57 F.3d 270, 283 (3rd Cir.1995); *Aiena v. Olsen*, 69 F.Supp.2d 521, 533 (S.D.N.Y.1999).

Even if such a claim is still cognizable in this circuit after *Mertens*, an essential element is an underlying breach by a fiduciary, in this case GE. *See Diduck v. Kaszycki*, 974 F.2d 270, 281–82 (2d Cir.1992) (laying out well-established elements of cause of action for knowing participation in fiduciary breach under ERISA). The Court will therefore first resolve the predicate question of whether GE breached its fiduciary duties.

### B. Prudence Attack on T-bill investment (Count III): GE's Motion for Summary Judgment

GE, in contrast to Martin, was indisputably a fiduciary at the time of the challenged T-bill investment. Plaintiffs claim that GE disregarded the interests of the participants in order to advance its corporate goal of closing the deal with Martin, thereby breaching its fiduciary obligations, obligations the Second Circuit has described as "the highest known to law." *Donovan v. Bierwirth*, 680 F.2d 263, 272, n. 8 (2d Cir.1982), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). *Donovan* further explained the statutory sources of this high duty:

> [ERISA] Sections 404(a)(1)(A) and (B) impose three different although overlapping standards. A fiduciary must discharge his duties 'solely in the interests of the participants and beneficiaries.' He must do this 'for the exclusive purpose' of providing benefits to them. And he must comply 'with the care, skill, prudence, and diligence under the circumstances then prevailing' of the traditional 'prudent man.'

*Id.* at 271. Plaintiffs cite to a myriad of cases emphasizing the gravity of the strict duties governing ERISA fiduciaries. *See e.g. John Blair Communications v. Telemundo Group*, 26 F.3d 360, 367 (2d Cir.1994) ("Where fiduciary duties arise under ERISA, they must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan"); *Reich v. Valley National Bank*, 837 F.Supp. 1259, 1286 (S.D.N.Y.1993) (A significant purpose of ERISA is to "immunize an employee benefit plan from the employer's interest," and so the statute "requires conformity to extremely high standards."); *Masella v. Blue Cross & Blue Shield of Conn.*, 936 F.2d 98, 107 (2d Cir.1991) (Because ERISA "abounds with the terminology of trust law," application of rule of contract interpretation construing ambiguities against insurer "is consistent with the basic principle of trust law that trust property is to be dealt with for the benefit of the beneficiary.").

The investment decisions of fiduciaries are likewise held to a high standard, although the ultimate outcome of an investment is not proof of imprudence or breach of fiduciary duties. *DeBruyne v. Equitable Life Assurance*, 920 F.2d 457, 465 (7th Cir.1990). In making investment decisions, trustees must conduct a "careful and impartial investigation," with "an eye single to the interests of the participants and beneficiaries." *Bierwirth*, 680 F.2d at 271. If the trustees perceive that they may be biased in favor of a particular investment course due to corporate interests, they are "bound to take every feasible precaution to see that they had carefully considered the other side . . . ." *Id.* at 276.

In applying the prudent person standard of the statute to investment decisions, "[a] fiduciary's independent investigation of the merits of a particular investment is at the heart" of the inquiry. *Valley National Bank*, 837 F.Supp. at 1273. Even if a fiduciary has failed to adequately investigate a particular investment, however, a reviewing court must consider whether, considering the facts that an adequate and thorough investigation would have revealed, the investment was objectively imprudent. *United States v. Mason Tenders*, 909 F.Supp. 882, 887 (S.D.N.Y.1995), *citing Fink v. National Savings and Trust Co.*, 772 F.2d 951, 962 (Scalia, J., concurring in part and dissenting in part). The Second Circuit's leading decision on fiduciary investment duties describes the standard as follows:

> The court's task is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983) ("courts have focused the inquiry under the 'prudent man' rule on a review of the fiduciary's independent investigation of the merits of a particular investment"). A trustee's lack of familiarity with investments is no excuse: under an objective standard trustees are to be judged "according to the standards of others 'acting in a like capacity and familiar with such matters.'" *Marshall v. Glass/Metal Association*, 507 F.Supp. 378, 384 (D.Haw.1980).

*Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.1984), *cert. denied by Cody v. Donovan*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506. Under these standards, plaintiffs claim that the record demonstrates triable factual issues on whether the GE fiduciaries violated their duties in segregating the $1 billion initial transfer amount and investing it in T-bills, rather than leaving it in the fully invested GE portfolio.

Defendant responds by distinguishing between fiduciary conduct that is subject to ERISA's requirements and settlor conduct that is not. The Court's ruling on the motions to dismiss concluded that "GE's statutory duties in the decisions at issue— i.e., the decision to transfer the assets to a new plan and the decision as to the amount transferred—are limited to the requirements set forth in Section 208." Ruling on Motion to Dismiss (Doc. # 144). Thus GE argues, given its compliance with Section 208, Martin and GE were free as settlors to negotiate the Transaction Agreement, set the valuation date, and agree that $1 billion plus 90–day Treasury Bill interest would be transferred at the closing. According to defendants, this conclusion necessarily follows from both the Court's earlier ruling and from the Supreme Court's observation in the intervening *Hughes Aircraft* decision that:

> In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets.... ERISA's fiduciary duty requirement is simply not implicated where [the employer], acting as the plan's settlor, makes a decision regarding the form or structure of the plan....

119 S.Ct. at 763.

The Second Circuit has since confirmed that § 208 does not require distribution of a plan's residual assets upon a merger. *Brillinger v. General Elec. Co.*, 130 F.3d 61, 64 (2d Cir.1997), *cert. denied*, 525 U.S. 1138, 119 S.Ct. 1025, 143 L.Ed.2d 37 (1999). However, in ruling on the prior motions to dismiss, this Court noted the possibility that plaintiffs could demonstrate a fiduciary breach, even given GE's undisputed compliance with § 208. *See*

Ruling on Motion to Dismiss (Doc. # 144). The question remains whether GE acted prudently and in accordance with its fiduciary obligations when, faced with the settlor requirement that it transfer $1 billion plus T-bill interest at a closing that was anticipated to occur within the first quarter of the next year, it made the decision to liquidate $1 billion of the plan's assets and invest the amount in 90–day Treasury bills.

Plaintiffs seem to accept this delineation, as the bulk of their argument focuses on the T-bill investment. According to plaintiffs, GE committed a fiduciary breach when it disinvested the $1 billion and basically, as they characterize it, held it in cash for a calendar quarter, regardless of the terms of the Transaction Agreement. The fact that the Agreement provided that such investment was to be made "consistent with GE's fiduciary duties under ERISA" is proof, to plaintiffs, that GE itself recognized that the investment decision was not immune from fiduciary oversight simply because it was made in connection with a corporate asset transfer. This point is not seriously disputed by the parties, as the GE trustees all testified to making an independent review before deciding to go through with the T-bill investment. Nor is it disputed that the T-bill investment resulted in substantially less being transferred to the new Martin plan than would have been the case had the $1 billion remained invested in GE's regular portfolio, and then been transferred along with all interest attributable to that amount stemming from the plan's regular investments. Where plaintiffs and defendant sharply diverge is whether the GE trustees, and GE itself as a fiduciary, should have overridden the deal struck in the Transaction Agreement, and borne the investment risk of keeping the transfer amount invested in the market, and then transferred the increased amount to the Martin plan at the closing. *See* Pl.Mem. in Opp., p. 27 ("Had defendants not caused the disinvestment, the GE Plan would have transferred the [increased] earnings to the Martin plan, just as the draft Agreements proposed.").

The logical problem with plaintiffs' argument is that it does, when stripped to its essence, seek to overturn GE's negotiated decision *as a settlor* to transfer a fixed amount at the closing. Had GE determined that the T-bill investment was not prudent, and kept the $1 billion in the Plan's investment portfolio, they would still have only been obligated to transfer that amount plus the T-bill interest rate at the closing, according to the terms of the Transaction Agreement. Martin rejected any offers to accept market risk on the transfer amount, demanding instead a fixed amount liquidated on the closing date, and as such would have had no rights to any additional investment returns generated had GE invested the transfer amount differently than set out in Agreement. Plaintiffs do not dispute that the initial transfer amount of $1 billion plus T-bill interest, when combined with the residual transfer, met the requirements of Section 208, and therefore any additional investment returns could have simply remained with the GE Plan without violating ERISA. *See Systems Council EM–3 v. AT&T Corp.*, 159 F.3d 1376 (D.C.Cir.1998) (plaintiffs' fiduciary and § 208 challenge to asset transfer approach during pension plan spin-off dismissed; even though valuation method utilized did not provide plaintiffs with 'benefit of actual market earnings' on transferred assets during interim period, plaintiffs are not entitled to the benefit of any interim increase since, as participants in defined benefit plan, they are entitled only to the level of benefits promised under the plan); *John Blair Communications v. Telemundo Group*, 26 F.3d 360 (2d Cir.1994) (finding that defined contribution spinoff plan was in violation of § 208 when amount transferred did not reflect gains occurring during the interim period before the actual transfer, but noting that if defined benefit plan were at issue, as here, "it would matter little to the individual [spinoff plan] participants

whether the plan lost out on roughly $500,-000 as long as those members were guaranteed their promised benefits at retirement.").

Although plaintiffs seek to obfuscate the issue with references to the trustees' inexperience in transfers of this magnitude and allegations that the trustees allowed GE's corporate interests in the merger to dominate its consideration of the investment decision, plaintiffs have not analytically separated out the settlor decision to make the asset transfer from the GE Trustees' fiduciary obligations within the context of that transfer. Plaintiffs charge that "settlors do not invest and disinvest plan assets—fiduciaries do," but this is a distinction without a difference, given that the investment decision was part of the mechanism by which a § 208–compliant merger was realized. Plaintiffs have not cited to any cases requiring a plan to transfer *more* assets than § 208 requires due to the fiduciary obligations of the transferring plan.

■ This essential flaw in plaintiffs' argument can be seen, in its most crystalline form, in the nature of the recovery sought and the identity of the plaintiff class seeking to recover it. The sub-class consisting of former GE employees who transferred to Martin pursue the imprudent investment claim. They seek the approximately $34 million in market gains allegedly lost due to the T-bill investment, and they seek these damages for the *Martin* plan. As pointed out by GE, the relevant ERISA provision makes a breaching fiduciary "personally liable to make good *to such plan* any losses to the plan resulting for each such breach." 29 U.S.C. § 1109(a). The alleged breach in this case occurred on December 31, 1992, the date on which the $1 billion was segregated from the GE Plan and invested in T-bills. At that point, the Martin pension plan for the transferred employees had not yet come into existence, and therefore any losses due to a fiduciary breach would have been sustained by the GE Plan, and would have to

be restored to that plan. Neither the Transaction Agreement governing the merger nor § 208 require that Martin receive any additional funds, even if had GE breached its fiduciary obligations in making the T-bill investment.

The Court also finds persuasive GE's argument regarding the inequity of awarding damages to the Martin Plan in these circumstances. As explained by the negotiations leading up to the Transaction Agreement described above, Martin only would have received additional interest if it had agreed to accept market risk on the $1 billion, a position it specifically rejected. If plaintiffs were allowed to proceed to trial, and prevailed on their claims, Martin would be granted an unwarranted windfall: after refusing to accept investment risk during the negotiations, it would now receive those funds risk-free, placing its Plan in a position of substantial overfunding and thus relieving Martin of the need to make further contributions. Such a result is not contemplated by either ERISA or by the fiduciary/settlor distinction drawn by the Supreme Court in *Hughes Aircraft.*

Plaintiffs nonetheless contend that had GE decided to keep the $1 billion initial transfer amount invested in its regular portfolio, the increased returns would have flowed to the new Martin Plan, despite the explicit language of the Transaction Agreement, based solely on the traditional trust rules embodied in the phrase "interest follows principal." Plaintiffs cite to *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), a case in which the Supreme Court concluded that interest on clients' trust accounts constituted private property, for purposes of the "takings" clause of the Fifth Amendment. As a basis for its decision, the Court noted "[t]he rule that 'interest follows principal' has been established under English common law since at least the mid–1700's." *Id.* at 165, 118 S.Ct. 1925. The Court also cited to numerous state court decisions recognizing this rule in their common law, including a Connecti-

cut Appellate Court case observing "[a]s long as the attached fund is used for profit, the profit ... is impounded for the benefit of the attaching creditor and is subject to the same ultimate disposition as the principal of which it is the incident." *Id., quoting Vidal Realtors of Westport v. Harry Bennett & Assoc.,* 1 Conn.App. 291, 297, 471 A.2d 658 (1984).

While a correct statement of the law, plaintiffs' argument is far too slender a strand on which to predicate the allocation of an additional $34 million to the Martin plan. *Phillips* and *Vidal Realtors* involve attempts to determine ownership of the interest earned during a time period where the ownership of the principal itself was beyond dispute. In *Phillips,* the client funds at issue were unquestionably the property of the clients, and were merely held in trust by the attorney pending distribution. 524 U.S. at 160, 118 S.Ct. 1925. In *Vidal Realtors,* a number of brokers laid claim to a $51,000 commission for a real estate sale, and because of the conflicting claims, the seller refused to pay the commission, although it was admittedly due, and instead placed the amount in an escrow account. 1 Conn.App. at 292, 471 A.2d 658. Upon resolution of the underlying dispute, the seller refused to turn over the $51,000 unless it could retain $8,000 in accrued interest for itself. The trial court ordered the seller to relinquish the interest, and the Appellate Court affirmed, finding that the defendant, as a garnishee, was not entitled to retain the accrued interest. *Id.* In contrast, Martin had no claim to the $1 billion transfer amount until the transaction closed; had the deal gone sour for GE and Martin, GE clearly would have retained both the $1 billion and any interest accrued. This is not a case where a party temporarily holds another individual's property in trust, as in *Phillips,* or where an acknowledged debt is due and owing, as in *Vidal Realtors.* Viewed simply, Martin and GE contracted for the exchange of a certain sum of money, and allocated the investment returns on that sum accordingly. *Phillips* and *Vidal Real-*

*tors* cannot trump the basic principles of contract interpretation, nor do they require GE to deliver to Martin more than it bargained for, potentially to the detriment of the remaining GE Plan participants.

The Court concludes that even assuming that the T-bill investment was imprudent, this class of plaintiffs cannot recover the relief they seek for the Martin Plan. GE's Motion for Summary Judgment on Count III is therefore GRANTED. As any claim that Martin knowingly participated in GE's breach would be derivative of their claim against GE, even if such a claim is still cognizable, Martin's Motion for Summary Judgment on Count III is GRANTED as well.

## C. Failure to Provide Information Claim (Count I): Defendant Martin's Motion for Summary Judgment.

Martin contends that no disclosure claim lies in the circumstances of this case, where GE employees were informed that pension benefits would be the same a month before the closing, and were given repeated assurances that the benefits at Martin would be 'substantially similar' and 'essentially equal' to those at GE. This argument will be evaluated in the context of GE's motion for summary judgment on the same grounds.

Martin asserts that even independent of the merits of plaintiffs' disclosure claim, it is entitled to summary judgment because it owed no fiduciary duties to Sub-class One plaintiffs. These plaintiffs were never employed by Martin and never participated in any Martin plan, and according to Martin, it owes no fiduciary duties at all to prospective employees. In support of this position, Martin refers to the definition of participant in ERISA, 29 U.S.C. § 1002(7): "any employee or former employee ... who is or may become eligible" for benefits. While plaintiffs in Sub-class One certainly fit into the latter part of this definition, in that during the relevant time period they may have "become eligible"

for Martin benefits had they accepted employment, they were not employees or former employees of Martin at the time the alleged misrepresentations were made. Were this Court to disregard the language of the statutory definition and extend fiduciary duties to potential employees, Martin contends, a string of deleterious consequences would result, from job offerees who decline employment suing employers for misrepresentations during the interview process, to the spectre of increased liability negatively affecting employers' willingness to maintain benefit plans at all.

Plaintiffs seek to avoid the effect of the statutory language by pointing to a number of cases in which plaintiffs not yet participants in ERISA plans have sued for misrepresentations related to the nascent plans. In each of these cases, however, the plaintiffs alleging fiduciary breaches were at least *employees* of the defendant and participants in the defendant's benefit plans at the time of the challenged communications, if not yet participants in the particular plan at issue. *See Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (communications to current employees regarding benefit plans at successor company); *Fischer v. Philadelphia Electric Co.*, 994 F.2d 130, 132 (3rd Cir.1993) (communications to current employees considering retirement regarding changes in early retirement benefits), *cert. denied*, 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993); *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 234–35 (3rd Cir.1994) (misrepresentations to defendant's employees at time employees given opportunity to enroll in new life insurance plan); *Smith v. Hartford Ins. Group*, 6 F.3d 131, 136 (3rd Cir.1993) (misrepresentations at time employees given choice to enroll in new medical plan). Plaintiffs have not directed the Court toward, nor has the Court been able to locate, any cases where fiduciary duties attached to communications by a potential or future employer.

The case containing language arguably supportive plaintiffs' claim is *Firestone v. Bruch*, in which the Supreme Court defined participant to mean "employees in, or reasonably expected to be in, currently covered employment," 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), *quoting Saladino v. I.L.G.W.U. National Retirement Fund*, 754 F.2d 473, 476 (2d Cir. 1985) (former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits is not "participant" within meaning of statute). *Bruch*, however, addressed only the question of what showing a claimant must make in order to be entitled to receive information under 29 U.S.C. § 1024(b)(4), and involved former employees who had been re-hired by the purchasing company. *Saladino*, the Second Circuit decision quoted by the Supreme Court in articulating this definition of participant, and also involving a former employee, noted that given the numerous obligations ERISA places on plan sponsors and fiduciaries vis-a-vis plan participants, such a group should be "easily identifiable" in order to provide certainty as to an employer's statutory obligations and to reduce costs to pension plans. 754 F.2d at 476. Expanding this group to include potential or future employees would undermine these goals.

■ Even though the GE employees who were contemplating a transfer to Martin were "easily identifiable," the fact remains that none of the Sub–Class One members accepted Martin's offer of employment. Allowing them to impose fiduciary obligations on Martin under these circumstances would greatly extend the scope of the statute to include an ever-expanding universe of potential or future employees, in derogation of the statutory definition and the cases interpreting it. It is unfortunate for Sub-class One members that the very uncertainty regarding their status that may have prompted their retirement results in their exclusion from the protections of ERISA, but the Court can-

not vault over the plain language of the statute in order ·to obtain what plaintiffs view as an equitable result.[4] In light of the precedent discussed above and the statutory definition at the heart of this dispute, the Court is persuaded that Martin's argument that Martin cannot be considered a fiduciary for potential employees prior to any of the plaintiffs becoming employees is the correct view.

Plaintiffs also allege Martin's knowing participation in this fiduciary breach, so as was the case with the prudence challenge to the T-bill investment, Martin's summary judgment motion must be evaluated in the context of GE's parallel motion, discussed *infra*.[5]

## D. Failure to Provide Information (Count I): Defendant GE's Motion for Summary Judgment.

In the September 1997 ruling on defendants' second motions to dismiss, this Court allowed plaintiffs' disclosure claim to stand, because it was "at least minimally pleaded to survive a motion to dismiss" insofar as the claim alleged that defendants' assurances about the provision of information, like the misrepresentations in *Ballone v. Eastman Kodak*, had "no reasonable basis in fact." 109 F.3d 117, 126 (2d Cir.1997). Ruling on Motion to Dismiss (Doc. # 160) at 7. The Court noted, however, that plaintiffs must be able to show after discovery that "1) they were promised certain material information; 2) that the defendants had that material information, and 3) that the defendants mis-

led the plaintiffs as to what the information was or withheld the information." *Id.*

Plaintiffs argue that they have met this standard, because the discovery record shows that Martin knew it would be providing *identical* benefits to those provided by GE, yet only disclosed that fact late in the process, and instead utilized "weasel words" such as 'substantially similar' and 'essentially equal' prior to that point. GE responds that it neither promised that information would be provided within a particular timeline, nor did it withhold any information concerning Martin benefits; in fact, GE argues, they could not have made any assurances about Martin's benefits, because such decisions were wholly within Martin's control. GE also urges the Court to grant summary judgment and reject plaintiffs' attempt to impose what it sees as "broad new disclosure requirements." No court has ever based a finding of fiduciary breach on such a diffuse claim as failure to provide information in a sufficiently prompt fashion, GE argues, when relevant material information was provided to all participants before any decision was required of employees.

■ The volume of case law on the subject demonstrates the importance of fiduciary obligations in the context of communicating about benefits. Under *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), communicating information about future plan benefits is a fiduciary function. *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 123 (2d

---

**4.** Alternative remedies for such nonparticipant future employees may be available under state common law causes of action for fraudulent, intentional or negligent misrepresentation or promissory estoppel, if such claims did not "relat[e] to" an ERISA plan for the purposes of preemption.

**5.** While the Court need not reach the question, given its resolution of GE's summary judgment motion, *see infra*, the situation of the plaintiffs in this case illustrates the equity of preserving a cognizable claim under ERISA against third parties who knowingly participate in a fiduciary breach. Martin

does not deny that it played a significant role in formulating and approving the Teaming Updates and other communications, nor that there was a substantial likelihood that some recipients of those communications would become Martin employees in the near future. Simply put, the employees of GE's Aerospace division were as close to being Martin employees as they could possibly be, without having yet signed on the dotted line. "Knowing participation" would allow participants to reach the conduct of such almost-fiduciaries, if an underlying breach is found.

Cir.1997) emphasized the principle that fiduciaries can be held liable for statements pertaining to future benefits, when the fiduciary knows those statements are false or have no reasonable basis in fact. 109 F.3d at 126. While under *Pocchia v. NYNEX Corp.*, 81 F.3d 275 (2d Cir.1996), *cert. denied,* 519 U.S. 931, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996), an employer has no duty to voluntarily disclose information about future changes prior to plan adoption, the Second Circuit has held fiduciaries liable for nondisclosure of information about a current plan even in the absence of a specific request, when the omitted information was necessary to an employee's decision about retirement. *Becker v. Eastman Kodak Co.*, 120 F.3d 5 (2d Cir.1997). It is under these principles that the current claim must be viewed.

Plaintiffs urge this Court to deny both GE and Martin's motions for summary judgment, arguing that they have presented triable factual issues on all the elements articulated in this Court's ruling on the motion to dismiss. First, plaintiffs claim that the Teaming Updates indisputably demonstrate that plaintiffs were promised they would be given material information about the benefits that Martin would provide in a sufficiently prompt manner to allow them to make employment decisions. The inaugural Teaming Update, for instance, told employees that they would be provided with "regular and complete reports" of the merger and that they would "receive comprehensive information on your benefits." Pl.D.Ex. 35. In the December 10, 1992 issue defendants stated that it was their "intention to keep you as fully informed as possible ... as information becomes available," Pl.D.Ex. 126, while the March 2, 1993 issue assured employees that "[t]here is ample time to make important decisions" and that GE and Martin were utilizing the Teaming Update and special mailings to employees' homes to provide benefits information "as soon as information about them is available." Pl.D.Ex. 138. While these statements do not amount to an unequivocal

promise to provide any and all relevant information, a reasonable fact-finder could interpret them as a representation that information would be communicated in a timely fashion. Any such promises were certainly qualified, however, by defendants' reminders that some complicated questions, such as benefits questions, would take longer to answer, as the merging companies "want to respond quickly to those concerns, but more importantly, we want our responses to be correct." Pl. D.Ex. 35.

The second element set out in the Court's earlier ruling requires plaintiffs to demonstrate that defendants actually had the material information that was promised. Plaintiffs claim that they have met this burden by providing evidence from which a reasonable fact-finder could conclude that Martin knew it had no choice but to provide *identical* benefits to the transferring GE employees, and that GE shared this understanding. Plaintiffs point to that portion of the Transaction Agreement which requires GE and Martin to enter into a benefit administration agreement "whereby GE shall provide investment, management, and administrative services with respect to benefit plans and arrangements adopted by the Parent...." Pl.D.Ex. 1 at GE 00975, ¶ V.04(c). Plaintiffs argue that this language demonstrates that defendants knew "that Martin had no practical alternative to continuing the exact same GE benefits," a conclusion they allege is confirmed by the deposition testimony of various Martin personnel that they had not considered changing GE's benefits. *See* Kinstle Dep. at 46–47, Pl. Vol. I (Q: "Do you recall identifying issues that raised the possibility that Martin—that caused Martin to have to consider changing the benefits in the plan? A: No, I do not. As a practical matter, the question was more could GE continue to administer and deliver the plan in our name.... I don't recall any issues that would have caused us to put the 'substantially similar' phrase in jeopardy."); McAl-

lister Dep. at 50, Pl. Vol. I ("I have no knowledge of anything that was being changed. We were concerned about what we considered to be the generosity of some of the benefits, but that was not going to be addressed in that interim period.") Niznik Dep. at 49–50 (Q: "Are you aware of any alternatives that were under consideration during that time frame to maintaining the plan design as is through the end of 1993 for the pension plan for the transferred employees?" a: "Well, the answer to your question has to be no. That's what the contract called for, and there was no alternatives that I remember being discussed.")

Plaintiffs also point to internal documents containing references to Martin's provision of "the same" or "mirror" benefits. The various references are described in more detail in the fact section above, but in summary it appears that at least some of the GE and Martin players involved in the transition were operating under the assumption that the post-sale 1993 benefits at Martin would, indeed, be the same as GE benefits. For instance, Martin's Roger McAllister took notes during a December 8, 1992 telephone conference, which read as follows:

Issues from letter—

—Savings plan—Answer Quick

—Welfare plans—Mirror

—Pension—same as now exist

Pl.D.Ex. 40. A letter from GE's Larry Cook dated December 9, 1992 states that "Bob McAllister, Manager—Compensation and Benefits Planning has confirmed Martin's intent to mirror all of the GE benefit plans and programs," and a summary apparently included with that letter entitled "1993 Post–Closing Employee Benefits Proposed Transition to New Plans" includes the language "MM will mirror GE benefits" under categories such as Payroll, Insurance Plans, and Pension Plans. Pl. D.Ex. 114. GE's Larry Cook and Martin consultant Rick Dunn also prepared a series of slides entitled "Payroll/Employee Benefits Transition Activities" for the De-

cember 15 meeting which indicate that "MM will mirror" GE benefits and/or plans for a number of programs, including insurance, pension, savings, flexible spending accounts, and others. Pl.D.Ex. 46. Further, on January 8, 1993 a Payroll and Benefits Transition project status report states that "MMC has agreed to provide pension and insurance benefits which are the same as GE's plans for the balance of 1993, except for the savings plan." Pl. D.Ex. 120.

Defendants argue in response that the "mirror" language was regularly protested by Martin's representatives, and that no agreement to provide identical benefits had been reached. Further, Martin claims that it purposefully used terms such as "substantially similar" and "essentially equal" in order to provide assurance to transferring employees yet still reserving its flexibility should legal or other barriers preclude adopting identical plans. Martin also explains its failure to provide constant updates on the status of its decision-making process as an effort to avoid "piecemeal" disclosure. See Rodgers Dep. at 128–129 ("We [Martin] typically communicate benefits in total, but, you know, we don't communicate until we feel confident that the information is accurate and complete."); Kinstle Dep. at 178 (Martin wanted "to give the participants a single document they could look to for the broadly based array of benefits that they could expect."). As the GE Savings plan was built around the purchase of GE stock, and legally could not be offered to Martin employees, it thus had to be substantially revised, which Martin alleges accounts for part of the delay in announcing the entire benefits package.

While the dispute evidenced in the record regarding when Martin had agreed to provide identical benefits might, in another case, preclude a grant of summary judgment, this Court has already held that Martin was not a fiduciary of the Sub-class One plaintiffs at the time it made these representations. The outcome of both GE

and Martin's motion, therefore, turns on the existence of any disputed material facts regarding GE's breach of its fiduciary obligations. GE advances the argument that it cannot be held liable for Martin's failure to make a timely decision about the benefits it would provide, nor could GE have made any assurances or representations about the Martin benefits in the absence of any definitive pronouncement by Martin. In fact, GE claims, it repeatedly pressed Martin to announce its post-sale benefits, and the undisputed record bears out this claim. *See* Pl.D.Ex. 131; McAllister Dep. at 125, 126, GE Ex. No. 16 ("Obviously, the GE folks and their communication group thought we were dragging out feet. They thought I wasn't responding and nobody else was responding as quickly as they would like to."); Rodgers Dep. at 82, GE Ex. 20 ("What I recall is that GE pressed us on just about any topic.... GE wanted to get—let's do it, do it, boom.").

 At heart, plaintiffs' claims against GE basically boil down to the contention that GE should have somehow compelled Martin to disclose its intended post-closing benefits earlier, or made the disclosure itself. From the Court's review of the lengthy and complicated record related to these motions, it is clear GE could do neither. First, aside from the contractually-agreed substantial similarity in benefits, GE had no control over the benefits that Martin would provide. As noted above, GE made several attempts to pressure Martin to release further information about the benefits it would offer, such as the faxed copy of the Philadelphia Inquirer article with the handwritten note by GE's Larry Cook. Pl.D.Ex. 131. But the fact remains that, despite its efforts, there was nothing GE could have done to compel Martin to commit to a particular benefits arrangement any earlier. Plaintiffs have submitted no evidence demonstrating that GE had some sort of authority or leverage to convince Martin to disclose its benefits, nor have they presented any theories as to

what steps GE could have taken that would have resulted in a more timely disclosure.

Secondly, had GE undertaken to independently communicate with its employees about Martin's benefits after the closing, it would have been doing so based on inadequate and, in some instances, incomplete information. For instance, the record demonstrates that McAllister, Martin's Manager of Compensation and Benefits Planning, initially indicated to GE's Cook that Martin would provide "mirror" plans, but that later Cook became aware that Martin had not made any such decisions, and that any understanding he had with McAllister "did not, in fact, reflect the actual decision process in Martin Marietta." Cook Dep. at 81, GE Reply App. Vol. II. Had GE nonetheless communicated that Martin would be providing identical benefits based on McAllister's telephone conversation with Cook, it would have been obliged to correct itself, thus engendering additional confusion and uncertainty regarding the transition process. Further, as pointed out by GE at oral argument, had GE promised its employees that Martin would provide identical benefits, it would have been incorrect, due to the changes in the savings plan, the product purchase plan, and other programs. GE may even have been subject to suit had it made such representations without an adequate basis in fact. *See Varity*, 516 U.S. at 498, 116 S.Ct. 1065 (misrepresentations regarding future benefits of employees transferred to newly-formed subsidiary). Requiring GE to disclose at best tentative, if not inaccurate and incomplete, information would fly in the face of much of the law that has developed regarding benefits communications. *See Mullins v. Pfizer*, 23 F.3d 663, 669 (2d Cir.1994) ("We do not require an ERISA fiduciary to be perfectly prescient as to all future changes in employee benefits. Nor do we require a fiduciary to disclose its internal deliberations."); *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1539 (3d Cir.1996) ("Too low

a [disclosure] standard could result in an avalanche of notices and disclosures.").

In sum, plaintiffs have failed to demonstrate triable issues on the second and third elements of their claim. They have not demonstrated that GE had any material information, as it was unable to speak about the benefits Martin would be offering after the closing. Moreover, plaintiffs have not shown that GE could have done anything else to allay their concerns regarding Martin's future benefits, given GE's fiduciary obligations and its lack of control over Martin's decision-making process.

The Court recognizes that finding no fiduciary breach by GE leaves plaintiffs in somewhat of a Catch–22, as plaintiffs' knowing participation claim against Martin necessarily fails in the absence of any GE fiduciary breach in which Martin could be said to have knowingly participated, yet that prerequisite breach cannot be shown because only Martin had the authority to disclose post-closing benefits. Plaintiffs are caught between their potential future employer, who has no ERISA fiduciary obligation to provide the information they seek, and their current employer, who is without the ability to provide that same information.

While the potential for unfairness to plaintiffs of this outcome is apparent, several aspects of this case persuade the Court that such a result is consistent with ERISA's statutory scheme and its purposes. First, the plain language of the statute itself compelled the Court's conclusion regarding Martin's fiduciary status. To the extent ERISA should be modified to reach the independent conduct of future employers or other third parties in the merger context, Congress is the appropriate entity to balance the competing interests at hand. Second, the Court is persuaded that requiring GE, an essentially blameless party on these facts, to defend its actions at trial simply to allow plaintiffs to reach the conduct of Martin would not further ERISA's purposes of encouraging

the creation of private benefit plans by minimizing the costs to the employer. *See Weil v. Retirement Plan Administrative Committee of Terson Co., Inc.,* 913 F.2d 1045, 1051 (2d Cir.1990) (*Weil II* ), *vacated in part on rehearing,* 933 F.2d 106 (2d Cir.1991) (*Weil III* ). Allowing trial to proceed would also have the counterintuitive effect of penalizing an employer that had sought to convey as much information as possible, even though it was prevented from providing full information by forces beyond its control.

Finally, any unfairness to plaintiffs is minimized by the unique facts of this case. The shadings between the information plaintiffs received—that benefits would be "substantially similar"—and the information they wanted—that benefits would be "identical"—are very fine indeed. While the Court is not willing to label the distinction immaterial as a matter of law, the fact remains that as of February 19, 1993, all GE employees knew that their pension, the central element of their benefits, would be calculated according to the identical formula at Martin as it had at GE. Pl. D.Ex. 71. The representative plaintiffs on Count III seek to minimize the impact of this fact by pointing to other benefit programs that were of concern, such as family medical coverage, but GE and Martin disclosed that the majority of the remaining benefit programs would be identical on March 23, 1993. Therefore, the information that plaintiffs claim should have been disclosed was provided prior to the time any employment or retirement decisions had to be made by GE employees.

For the reasons outlined above, GE's motion for summary judgment on Count III of the complaint is GRANTED. As plaintiffs' claim against Martin necessarily fails as well, Martin's summary judgment motion on Count III is also GRANTED.

### E. Partial Termination Claim Against Martin (Count II)

Plaintiffs' final claim alleges that the substantial layoffs at Martin after the GE

and Lockheed mergers constituted a partial termination of the Martin "Trans Op Plan," and that under applicable regulations and the language of the plan participants were therefore entitled to a pro-rata allocation of the surplus assets. Defendant Martin attacks this claim on a number of grounds, arguing that a partial termination does not trigger allocation of surplus assets; that the count should be dismissed for a failure to exhaust; and that plaintiffs cannot prove that a partial termination occurred.[6] The Court will address the arguments in turn.[7]

**1. Allocation of surplus assets on partial plan termination.**

As a general matter, ERISA requires that a retirement benefit plan, in order to qualify for favorable tax treatment, must provide that upon "partial termination" of such plan:

[T]he rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable.

26 U.S.C. § 411(d)(3). The applicable Treasury regulations under this section state that "[a] plan is not a qualified plan

... unless the plan provides for the allocation of any previously unallocated funds to the employees covered by the plan upon the termination or partial termination of the plan...." 26 C.F.R. § 1.411(d)–2(a)(2)(i). The regulations go on to read as follows:

Paragraphs (a)(2)(I) and (ii) of this section do not require the allocation of amounts to the account of any employee if such amounts are not required to be used to satisfy the liabilities with respect to employees and their beneficiaries under the plan.

26 C.F.R. § 1.411(d)–2(a)(2)(iii).

In accordance with these requirements, the relevant section of the Martin Plan provides that:

XIV(2) PARTIAL TERMINATION

In the event of partial termination of the Plan with respect to a specified group of participants, the Corporation shall cause the proportionate interest of such Participants in the Plan's Pension Fund to be determined by the Plan's Actuary and segregated by the Trustee to provide benefits to or on behalf of such Participants in accordance with the provisions of this Section XIV(3).

That section, in turn, reads:

XIV(3) TERMINATION AND ALLOCATION OF PLAN PENSION FUND

---

**6.** At oral argument, counsel for Martin advanced an argument positing that participants did not have standing to challenge a plan's asserted noncompliance with the Internal Revenue Code, as no private right of action existed. Aside from the fact that this argument was not briefed, in the second motion to dismiss Martin argued that due to the lack of a private cause of action, plaintiffs' claim must be brought under ERISA's civil enforcement scheme, and was thus subject to the exhaustion requirement. Martin renews this exhaustion argument on summary judgment. As it appears that the case has been litigated under the assumption that plaintiffs could challenge a failure to declare a partial termination under § 502(a)(3) to "redress [ ] violations" of ERISA or the terms of the plan, the Court will not re-examine plaintiffs' standing at this juncture.

**7.** In addition, in its brief Martin contended that plaintiffs do not have standing to pursue

this claim. Defendant argues that since the only remedy on partial termination is immediate vesting, and all Subclass Two representatives are already 100% vested except for Donald Bloyer, whose termination was voluntary, no plaintiffs have standing to assert the partial termination claim. *See Sage v. Automation, Inc. Pension Plan Trust,* 845 F.2d 885, 891 (10th Cir.1988) (Participants who were not terminated in connection with the significant corporate event that gave rise to the partial termination are not "affected" by such partial termination for standing purposes). The Court need not decide this issue, however, as plaintiffs moved to join three additional named plaintiffs who are members of Subclass Two and were not vested at the time their employment was terminated. The magistrate judge granted this motion, and plaintiffs' amended complaint was filed in October of 1999. Defendant's standing argument is therefore moot.

In the event of termination of the Plan, or partial termination of the Plan as defined in ERISA, each Participant's accrued benefit, determined in accordance with the provisions of the Plan and his participation to the date of such termination, shall become fully vested and nonforfeitable to the extent funded and shall be guaranteed by the Pension Benefit Guaranty Corporation....

Martin Ex. JJ at 67–68. The Plan then goes on to list the order of preference for the payment of benefits from the portion segregated pursuant to section XIV(2), quoted above. *Id.* This schedule does not provide for the distribution or allocation of surplus assets, and only directs payment for certain categories of "benefits." *Id.* at 68.

Plaintiffs argue that the language of the Treasury regulations requires that all surplus assets be allocated to participants upon a partial termination. As a threshold issue, there is a logical inconsistency in plaintiffs' argument: a partial termination by the very nature of the term implies that at least some portion of the plan continues in existence, but as the current plan is a defined benefit plan, the entire plan would have to terminate before the sponsor could calculate what portion of the plans' assets were actually surplusage after satisfying all the plans' benefit liabilities. *See Wilson v. Bluefield Supply Co.*, 819 F.2d 457, 464 (4th Cir.1987) (" 'Surplus' is the term used in the common law of trusts to describe any remaining assets in a trust after its purpose has been fulfilled.")

In addition, plaintiffs' argument is contradicted by the language of the statute and regulations themselves. As noted above, section 411(d)(3) protects "benefits accrued," and the Treasury regulations defining terms in § 411 provides that in the case of a defined benefit plan the term generally "refers only to pension or retirement benefits" and does "not include ancil-

lary benefits not directly related to retirement benefits." 26 C.F.R. § 1.411(a)–7(a). *See Borst v. Chevron*, 36 F.3d 1308, 1315 (5th Cir.1994) (concluding that, based on definition in Treasury regulations, "benefits accrued" in § 411(d)(3) does not encompass a right to a share of the surplus assets if not specified in the plan itself), *cert. denied*, 514 U.S. 1066, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995). The regulations also suggest this conclusion by carefully noting what § 1.411(d)–2(a)(2)(i) do *not* require: allocating amounts to the accounts of participants that are in excess of the amount necessary to satisfy the plan's liabilities to those employees.[8] The language of these regulations suggests that any claim to surplus assets is not a "right[ ] ... to benefits accrued" under the Plan.

Further, plaintiffs have cited to no cases where courts have concluded that a partial termination required an allocation of surplus assets to plan participants in defined benefit plans, and in fact most relevant case law, including recent Supreme Court pronouncements, supports the opposite result. As concluded in the Court's September, 1996 ruling on defendants' motions to dismiss, "a defined benefit plan gives current and former employees property interests in their pension benefits, but not in the assets held by the trust." Ruling on Motion to Dismiss (Doc. # 144), *citing Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184 (7th Cir.1994). More recently, the Supreme Court also held that participants in a defined benefit plan "have no entitlement to share in a plan's surplus...." *Hughes Aircraft,* 119 S.Ct. at 761. Even prior to the Supreme Court's pronouncement, every circuit court that considered the issue has reached the same conclusion. *See Malia v. General Elec. Co.*, 23 F.3d 828 (3rd Cir.1994), *cert. denied*, 513 U.S. 956, 115 S.Ct. 377, 130 L.Ed.2d 328 (1994); *Brillinger,* 130 F.3d at 62. Such principles

8. Whether outstanding surplus assets may be considered a liability of the plan is considered *infra* at 270.

would seem fully applicable to the case of a partial termination.

In *Bennett v. Conrail Matched Savings Plan Admin. Committee,* 168 F.3d 671 (3rd Cir.1999), *cert. denied,* — U.S. —, 120 S.Ct. 173, 145 L.Ed.2d 146 (1999), the Third Circuit held that in the case of the partial termination of a defined contribution plan, participants were not entitled to share in the surplus assets. The court explained its reasoning based on a distinction set out in Third Circuit case law: "[a]s we determined in *Malia,* accrued benefits are liabilities of a plan; assets (such as surplus) fall on the other side, the asset side, of the balance sheet." *Id.* at 676. The accumulated surplus assets of a plan were thus not properly considered "outstanding liabilities" of the plan under the Treasury regulations quoted above, and the court upheld the dismissal of plaintiffs' complaint. *Id.* Similarly, the Fifth Circuit in *Borst* cited *Malia* in support of its conclusion that plaintiffs had no statutory entitlement under § 411(d)(3) to a pro rata share of residual or surplus assets on partial termination of a defined benefit plan. 36 F.3d at 1317.

The conclusion that § 411(d)(3) and its implementing regulations require only that all participants become fully vested upon partial termination of a plan is further supported by the outcome in *Weil III,* 933 F.2d at 106. A group of terminated employees brought suit arguing that a partial termination had occurred at the Terson companies, entitling them to certain vested benefits. In the third trip to the Second Circuit in *Weil III,* the court vacated that part of its previous decision in *Weil II* which limited the measure of partial plan terminations to nonvested participants. The court still noted legislative history that referred to § 411(d)(3) as "the rule of full immediate vesting," but concluded that the legislative intent behind that section was ambiguous, because "it is equally arguable that in enacting this section, Congress mainly intended to prevent employers from abusing pension plans to reap tax

benefits." *Id.* at 108, 109. The court then determined that the IRS rule, which counted both vested and nonvested participants when determining the appropriate ration at which partial terminations occurred, was a permissible construction of the statute. Inasmuch as the district judge had so ruled in his original opinion, vacated by *Weil II,* the circuit court reinstated that order "that defendants purchase annuities sufficient to provide benefits to plaintiffs equivalent to the actuarial present value of their benefits," in addition to attorney's fees and costs. *Id.* at 110. No provision for excess or surplus assets was made.

At oral argument, counsel for plaintiffs attempted to avoid the ineluctable force of this authority by arguing that plaintiffs sought only an *allocation* of the surplus assets, rather than a *distribution.* This semantic distinction, however, does not dictate a different result. First, the applicable regulations quoted above use the terminology "allocate," expressly noting what the regulations do *not* require: an "allocation of amounts to the account of any employee if such amounts are not required to be used to satisfy the liabilities with respect to employees and their beneficiaries under the plan." 26 C.F.R. § 1.411(d)–2(a)(2)(iii). Second, the cases finding against plaintiffs' position in this matter often use the terminology employed by plaintiff, to the opposite effect. *See e.g., Rummel v. Consolidated Freightways,* 1992 WL 486913 (N.D.Cal.) (Granting motion to dismiss partial termination claim because "[p]laintiffs have not identified a single court decision or agency ruling holding that the unaccrued assets . . . must be immediately *allocated* upon a partial termination.") (emphasis added). An allocation or a distribution would have the same effect, albeit at different junctures: giving participants a claim of right to surplus assets. Such a claim is not supported by the case law or the statute and its implementing regulations, and thus plaintiffs' parsing of the phraseology of their claim does not cure its flaws.

As the statute and applicable regulations do not provide a basis for plaintiffs' claims to an allocation of excess assets, they must seek support in the language of the Plan itself. Yet their arguments based on an interpretation of the Martin Trans Ops Plan are to no avail. The plan provides, in accordance with ERISA, that "each Participant's accrued benefit ... shall become fully vested and nonforfeitable" in the event of a partial termination. Martin Ex. JJ at 68. The plan also orders the priority of payments from the plan pension fund in the case of a full or partial termination, but does not direct the allocation of any surplus. Instead, the plan only orders the payment of various categories of benefits. The final category in this list on which plaintiffs rely provides that the Plan's funds shall be used to pay or provide for "the benefit with respect to Participants vested in accordance with the provisions of this Section ... and not heretofore provided for in this Section....," i.e., those plaintiffs vested upon partial termination. *Id.*

The Court declines the plaintiffs' invitation to interpret the language of this "catch-all" provision to require an allocation of all the surplus assets. The final section, like the other five categories before it, speaks only in terms of *benefits*, not residual or excess assets. As noted by the Third Circuit in *Malia:*

> '[B]enefits' are elements that are conceptualized and treated differently in a

plan termination than are 'assets' of that plan. 'Benefits' are computed in a different manner than 'assets.' Accrued benefits are placed on the liability side, rather than on the asset side of the balance sheet.

23 F.3d at 832. In addition, the Martin Plan contains a clause allowing reversion of plan assets "after provision for all benefits and expenses in accordance with the foregoing." Martin Ex. JJ at 69.[9] Under the normal rules of contract interpretation, this provision would be rendered superfluous if one read the "catch-all" section to require the distribution of all excess assets.[10]

■ In conclusion, neither the Plan language nor ERISA and its implementing regulations requires an allocation of surplus assets as a remedy for partial plan termination. Therefore, even assuming that there was a partial termination due to the substantial layoffs, plaintiffs would only be entitled to a vesting of their accrued benefits, under the applicable Treasury Regulations and the language of the Plan.

### 2. Exhaustion Requirement

The Court's conclusion that neither the terms of ERISA nor the Plan require distribution or allocation of surplus assets upon partial plan termination does not dispose of Count II in its entirety, because those plaintiffs who were nonvested partic-

---

**9.** While no assets transferred from the GE Pension Plan could ever revert to Martin under the terms of the Transaction Agreement, plaintiffs have not claimed that the alleged partial termination worked a reversion of any portion of those assets.

**10.** ERISA also allows a reversion of excess assets to the employer. Section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), outlines the circumstances under which employers may recapture surplus assets:

[A]ny residual assets of a single-employer plan may be distributed to the employer if—

(a) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

In *In re Gulf Pension Litigation,* 764 F.Supp. 1149 (S.D.Tex.1991) the court cited this section as support for its holding that ERISA did not require distribution of surplus assets upon partial plan termination. "Allowing an employer to recover surplus assets if these conditions are met is consistent with the policies underlying ERISA. Employers will continue to fund their plans under ERISA guidelines, but will not be penalized for overfunding in 'an abundance of caution' or as a result of a miscalculation on the part of an actuary." *Id.* at 1184 (internal citations omitted).

ipants in the Martin Plan still would be entitled to full and immediate vesting in the case of a partial termination. Thus, the Court must consider whether these nonvested participants have presented sufficient evidence to warrant a trial on their partial termination claim. Defendant contends that no trial is required, because plaintiffs failed to pursue their internal plan remedies before bringing suit in federal court.

This Court's second ruling on the motion to dismiss cited *Kennedy v. Empire Blue Cross & Blue Shield* for the "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." 989 F.2d 588 (2d Cir.1993). *See* Ruling on Motion to Dismiss (Doc. # 160) at 10. The Court did not consider the exhaustion issue as grounds for dismissal, however, as the "procedural posture of *Kennedy* suggests that while a showing of exhaustion or futility is needed, it is not a technical pleadings requirement, but implicates fact-dependent issues." Ruling on Motion to Dismiss (Doc. # 160) at 12, *citing Kennedy*, 989 F.2d 588, 592 (court converted motion to dismiss on exhaustion grounds to motion for summary judgment in order to consider material external to the complaint). Martin now urges the Court to grant summary judgment on this issue, as plaintiffs failed to exhaust their administrative remedies. Plaintiffs counter that exhaustion is not required in the context of partial plan terminations, and that any such attempt would have been futile.

Plaintiffs point to no case where exhaustion was explicitly excused in an ERISA case based on a partial termination claim. Rather, these cases often arise after a plan administrator or committee has determined that no partial plan termination occurred. *See, e.g., Weil II*, 913 F.2d at 1047 (Administrative committee of retirement plan determined that partial termination had not occurred, following which plaintiffs brought suit); *Kreis v. Charles O. Townley, M.D. & Assoc.*, 833 F.2d 74 (6th Cir. 1987) (after Plan Administrator decided

that partial termination had not occurred and denied plaintiffs' claims for accrued unvested benefits, plaintiffs brought suit in federal court); *Admin. Committee, Sea Ray Employees' Stock Ownership, Profit Sharing Plan v. Robinson*, 164 F.3d 981 (6th Cir.1999) (litigation followed determination by Plan Administrative Committee that no partial termination had occurred). Plaintiffs argue that under the particular circumstances of this case, the Court should not require resort to the remedies under the Plan. In particular, plaintiffs argue that exhaustion is not appropriate because questions of law are involved, not the interpretation and application of specific plan-based benefits rules. In cases involving claims for benefits under the terms of the plan, the argument continues, the experience and expertise of the plan officials and the goal of consistent decision-making under the plan may call for deference to fact-finding by plan administrators, but the purpose of the exhaustion requirement is not pertinent to the nature of this claim, which involves employment events external and unrelated to the plan. *See* Pl.Mem. in Opp. at 28.

This Court excused the exhaustion requirement in *MacKay v. Rayonier, et al.*, 25 F.Supp.2d 47 (D.Conn.1998), in which it concluded that it made "little sense" to apply the exhaustion requirement to counter-claim plaintiff's § 510 retaliation claim, as it would require claimants to utilize the internal review procedures of the entities which allegedly discriminated against him. "This logic is particularly appealing since no plan administrator's decision on any particular plan term is implicated by the employer's overall alleged motivation to deprive the discharged employee of benefits to which he or she may otherwise become entitled." *MacKay*, 25 F.Supp.2d at 50. In contrast, the plan at issue in the instant case does include a provision governing partial termination, and the subjective motivation of the employer is irrelevant to the individual cases. Rather, the sole issue for the administrator to decide

would have been whether the requisite number of terminations had occurred, and plan officials may have had more familiarity with and access to the appropriate data to make that determination. Thus, this Court's decision in *MacKay* is distinguishable.

The Court has been able to locate only two cases addressing the issue, with one coming down on each side of the question. When faced with a claim that alleged a partial termination of the pension plan, the Northern District of Illinois ordered plaintiffs to exhaust their internal remedies prior to bringing suit. *Schultz v. The Quaker Oats Co.*, 1999 WL 90629 (N.D.Ill.). The court reasoned that requiring exhaustion in these circumstances served the purposes of the exhaustion requirement, identified by the Seventh Circuit, of minimizing frivolous lawsuits, promoting nonadversarial dispute resolution, decreasing the cost and time of claim settlement, and promoting Congress' intent that trustees have the primary responsibility for claims processing. *Id.* at *4. However, the district court also relied on a Seventh Circuit decision requiring that § 510 claims be presented to the plan administrator prior to the initiation of a federal suit, an outcome this Court rejected in *MacKay*. *See* 25 F.Supp.2d at 50, *citing Lanford* (disagreeing with reasoning of Seventh Circuit in *Kross v. Western Elec. Co.*, 701 F.2d 1238 (7th Cir.1983)). The District of Alaska, in contrast, has held that participants need not exhaust administrative remedies to pursue a partial termination claim, but premised that conclusion on its reading of the language of the Plan. *Thayer v. Alaska Teamster-Employer Pension Trust*, 1993 WL 173710 (D.Alaska) ("From my review of the Trust Agreement ... I conclude that there were no procedural provisions for the type of review envisioned by 29 U.S.C. § 1132, and that therefore plaintiffs had no internal remedies to exhaust.") Both of these cases are short on analysis, however, and the merits of their competing views cannot be adequately assessed.

In this Court's view, partial termination claims such as the one asserted by plaintiffs should properly be presented to the plan administrator in the first instance. There is no internal inconsistency in such a requirement as may be present in § 510 claims, because there is no presumed hostility on the part of the plan administrator to participants and beneficiaries claiming a partial termination; to the contrary, in the partial termination context the number of affected employees is necessarily large, thus negating any inference of individual animus. Several of the purposes of the exhaustion requirement in ERISA cases will also be served by extending it to partial termination claims, in that it will "uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts," and "provide a sufficiently clear record of administrative action if litigation should ensue." *Kennedy*, 989 F.2d at 594. This case could be seen as an object lesson on the importance of this latter purpose, given the disputes and confusion regarding which termination codes should be considered employer-initiated terminations for purposes of calculating the relevant percentage. Had plaintiffs pursued their claims administratively before bringing a federal suit, the plan trustees and administrators would have been able to gather documentation and conduct statistical analyses on this issue, rather than presenting a federal court with reams of confusing and sometimes internally inconsistent data. *See e.g.*, Pl.Ex. 3 (Greenstein Report, with Accompanying Data).

Further, as the Court has determined that the only remedy in the context of a partial termination is immediate vesting for all participants, requiring exhaustion would not put plan administrators and trustees in the untenable position of determining the disposition of potentially millions in surplus assets; rather, they would simply decide whether the requisite number of terminations had been reached, and if so, deem claimants fully vested. Determinations of vesting and eligibility are nor-

mally within the province of the plan administrator, and plaintiffs have pointed to no internal conflicts or difficult legal questions that would arise from giving plan administrators the first pass at the question.

The Court also does not believe imposing an exhaustion requirement in this context would be unduly burdensome to potential claimants. While filing of their federal claims may be delayed by at most 6 months, Martin Ex. JJ at 62, success at the administrative level would provide benefits in a more timely fashion and at reduced cost than would full-blown litigation. To the extent a plan administrator or trustee bears some animus or unfairly skews the determination process, any administrative decision regarding plan terminations would be subject to de novo review by this court. *See Weil II,* 913 F.2d at 1049 ("We agree that the determination by plan administrators as to whether a partial termination has occurred is not subject to deference, and, accordingly, we conclude that the district court properly reviewed the Committee's denial of benefits to plaintiffs under a de novo standard of review."), *vacated on other grounds,* 933 F.2d 106 (2d Cir.1991). This does not weigh in favor of excusing a first-level administrative decision, as plaintiffs would have it; rather, it operates as insurance that, should the administrative process fail claimants in some way, a federal court will be able to intervene and provide participants with a remedy.

█ Plaintiffs seek to invoke an exception to the exhaustion requirement by asserting that proceeding administratively would have been futile in this case. Determining the applicability of the futility exception involves reviewing the terms of the plan as well as the actions of the various parties. As this Court has previously observed, exhaustion in the context of ERISA requires only those administrative appeals provided for in the relevant plan or policy. *MacKay,* 25 F.Supp.2d at 50, citing *Kennedy,* 989 F.2d at 592. Accord-

ing to the terms of the Martin Plan, a participant may "request a review of his claim upon written application to the Vice President, Benefit Finance and Administration...." Martin Ex. JJ at 62. This vice president is to conduct a "full and fair review of a denial of a claim" and shall "render a decision as promptly as possible, but no later than 120 days after receipt of a request for review." *Id.* This decision "on matters of denial of claims shall be final and binding on all parties for the purpose of review under the provisions of this Plan." *Id.* at 63.

Plaintiffs view this review procedure as inadequate to address their claims, because: 1) the plan has no previous experience in assessing questions of partial termination; 2) the plan has no appeal procedure specifically applicable to these issues; and 3) the plan itself did not have access to the correct data about the employment terminations until March 1999. Pl.Mem. in Opp. at 29. Plaintiffs have not further explained this last contention, nor have they cited to any portion of the record in support. The Court does not find, in any event, that it provides grounds for the application of the futility doctrine, as it does not speak to what information the Plan could have accessed had such a claim been filed.

█ The lack of previous experience in assessing partial termination claims and the absence of any specific plan provision for addressing them do not constitute adequate justification for failing to exhaust. As an initial matter, the Plan cannot gain experience or expertise in these sorts of cases if claims are not brought to the plan in the first instance. Further, the case law interpreting the futility exception demonstrates that the unusual or unprecedented nature of a claim is not grounds for excluding it altogether from the administrative regime. "Usually, the futility exception is applied in a context in which there has been, in some form, an unambiguous application for benefits and a formal or informal administrative decision deny-

272

ing benefits and it is clear that seeking further administrative review of the decision would be futile." *Barnett v. IBM*, 885 F.Supp. 581, 588 (S.D.N.Y.1995). The Southern District also canvassed the applicable case law on the futility exception in *Ludwig v. NYNEX*, 838 F.Supp. 769, 781 (S.D.N.Y.1993). The court observed that federal courts have invoked the futility doctrine in the following circumstances: 1) where the claimant brings a claim under § 510 of ERISA; 2) where, for summary judgment purposes, there is a material issue of fact as to whether the claimant has "properly appealed" a denial of benefits through the specified administrative channels; 3) where the plan has failed to respond to the claimant's, or the claimant's representative's, written request for a review of the plan's benefit eligibility determination; 4) where there is a material issue of fact as to whether the plaintiff was informed of the appeals process; or 5) where the plan fiduciary has acted in bad faith, in breach of its fiduciary duties. *Id.* (citing cases). Such is not the case on these facts.

The nature of the futility exception renders it inapplicable to partial termination claims, and the Court is not persuaded by plaintiffs' arguments to the contrary. As the Court has decided that the exhaustion requirement applies to the claims of non-vested participants, and that plaintiffs are not excused on the grounds of futility, summary judgment will enter on Count Two of Plaintiffs' Complaint. The non-vested plaintiffs in Count Two are required to first present their claims to the Vice–President of Benefit and Finance, as provided for under the terms of the Plan, before seeking federal review of their partial termination claim. As the Court has determined that the only remedy in case of a partial termination is full vesting, not allocation of surplus assets, and that exhaustion is required, it need not reach defendant's final argument that the percentage reductions disclosed here are insufficient to create a partial termination as a matter of law.

## IV. CONCLUSION

For the reasons stated above, GE's Motion for Summary Judgment as to all GE Defendants (Doc. # 208) and defendant Martin Marietta's Motion for Summary Judgment (Doc. # 204) are GRANTED. The clerk is directed to close the case.

**IT IS SO ORDERED.**